**PALAKIKO et al. v. TERRITORY OF HAWAII.**

No. 12638.

United States Court of Appeals
Ninth Circuit.

March 27, 1951.

George T. Kobayashi, Bert T. Kobayashi and Tin Seong Goo, all of Honolulu, T. H., for appellant.

Chas. M. Hite, Public Prosecutor of the City and County of Honolulu, Allen R. Hawkins, Asst., Honolulu, T. H., for appellee.

Before STEPHENS, HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellants, Majors and Palakiko, were tried in a Circuit Court of the Territory of Hawaii upon an indictment charging them with murder while committing the crime of rape, murder while attempting to commit rape, and murder with extreme atrocity and cruelty. They were found guilty as charged, sentenced to death, and upon error to the Supreme Court of Hawaii the judgment was affirmed. This is an appeal from that judgment of affirmance, upon the single specification of error that "appellants were denied 'due process of law' * * * under the Fifth Amendment * * * in that, the confessions which were introduced in evidence and used against the appellants in the trial court were not voluntarily made by the appellants." [1]

The body of the murdered woman was discovered in her home, where she lived alone, on March 16, 1948. Death had apparently occurred 3 to 5 days before. She had been gagged and bound, her jaws had been broken, and the position and condition of her clothing indicated rape had been committed or attempted. Palakiko and Majors, convicts confined in Oahu prison, had escaped from a work gang on March 10. On March 12, Palakiko was recaptured. After discovery of the murder, and on March 20, Palakiko was questioned and made one of the statements here in question, admitting participation in the breaking and entry into the victim's house, and implicating Majors.

About 12:40 A.M. on March 21, Majors was apprehended riding as a hitchhiker in a car which police officers stopped at a roadblock. When the officers opened the car door and saw the bundle which Majors was carrying, (which was later found to contain canned goods and other articles from the murdered woman's house), and learned that he was a stranger to the driver, they pulled Majors from the car. He broke away momentarily, and attempted to drink a bottle of iodine. As an officer struck the bottle from his hands Majors "slumped down to the ground as though going unconscious." He was rushed to a near-by hospital where his stomach was pumped out and his mouth burns treated.

At 2:55 A.M. detective Stevens of the Honolulu police department questioned Majors for about an hour. There is nothing in the record as to what Majors then said. He was in bed, he had some difficulty in talking, said his throat was burning, but did not object to talking. At 4:30 A.M. Majors was given 4 grains of phenobarbital as a sedative. In consequence of that he slept for most of that day, off and on. Beginning about 9 A.M. he was given 10 grains of aspirin crushed in cream every two hours for the burns of his throat.

At 10:45 the same morning Majors was again questioned by Officer Stevens, this time in the presence of two other officers, and of a shorthand reporter whose transcription of the conversation with Majors

1. Under § 1293 of Title 28 U.S.C.A. this Court's review of such judgments of the Supreme Court of Hawaii is limited to "cases involving the Constitution, laws or treaties of the United States or any authority exercised thereunder * * *." Young v. Territory of Hawaii, 9 Cir., 160 F.2d 289.

constitutes one of the three statements made by Majors which are in question here.

A physician, resident psychiatrist at the hospital, who examined Majors, was not present when this statement was taken, but testified that he believed Majors was competent to speak to a police officer at that hour. He testified that the effects of the pheno-barbital would last about 15 hours, during which the patient would awaken at different periods, when he would be able to think and talk; that the pheno-barbital would make him sleepy, and that the burns in the mouth and throat would be painful. This interrogation lasted from 10:45 to 11:30 A.M.

The next afternoon, March 22d, at 2:50 P.M., a second statement was taken from Majors. Again Officer Stevens questioned Majors, in the presence of two other officers, and of a police stenographer who took the questions and answers in shorthand. This was the second confession in question here.

Majors then asked to see Captain Straus of the Honolulu police, stating that he wished to give Straus a statement. Accordingly, on March 24, after Majors had left the hospital, he talked to Captain Straus, at the police station, in the presence of three other police officers, including Detective Stevens. Palakiko was also present. The questions and replies were taken in shorthand by a police stenographer. The notes were later transcribed and the transcribed written statement was signed by Majors. Neither of the two earlier statements were signed. The record does not disclose whether he was asked to sign them.

In ruling upon the admissibility of the offered statements the trial judge, in an extended review of the evidence to which reference will be made hereafter, found that they were made voluntarily. Although the record does not contain the instructions given the jury, the recitals in appellants' assignments of error in the Territorial Supreme Court indicate that the jury was instructed upon the question of the required voluntary character of the confessions. At any rate, there is no claim here that any defect in the charge to the jury has any bearing upon the issue now before us. The Supreme Court of Hawaii found that the confessions were "voluntarily made without the slightest indication of force, threat, duress, or promise of reward or immunity and therefore clearly admissible."

■ Notwithstanding these findings of the Hawaiian courts, in our consideration of the question of due process under the Fifth Amendment it is our duty to make an independent examination of the record, in the same manner in which that is done by the Supreme Court in the review of the judgments of state courts claimed to have resulted from the use of confessions obtained in violation of the due process clause of the Fourteenth Amendment.[2]

As for the Palakiko confession, there is no evidence whatever that it was not entirely voluntary. It will be recalled that Palakiko was apprehended before the murder had been discovered. Four days after the body of the victim was found, Palakiko was interrogated by Capt. Straus at the Police Department in the presence of Capt. Kennedy and of the police stenographic reporter who recorded the interrogation in shorthand. This questioning began at 6:50 P.M. and was concluded at 7:38 P.M. Palakiko was then taken to the scene of the crime where questioning was resumed and he was asked to point out the places in the victim's home to which he had referred in the prior examination. He described the movements of the defendants after they entered the house, pointing out the location of various rooms and objects. This later questioning, which began at 8:05 P.M. and concluded at 8:40 P.M., was in the presence of 13 police officers in addition to Capt. Straus who asked the questions. The completed statement, including questions both at the police station and at the scene of the crime, was signed by Palakiko. (The typewritten records of the signed statements disclose

2. Ashcraft v. Tennessee, 322 U.S. 143, 147, 64 S.Ct. 921, 88 L.Ed. 1192; Chambers v. Florida, 309 U.S. 227, 228, 60 S.Ct. 472, 84 L.Ed. 716; Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1357, 93 L. Ed. 1801.

the initials of the persons making the statement along the margins. This suggests that they probably initialed corrections in the text. The original exhibits have not been furnished here.)

When the Palakiko statement of March 20 was offered, the court examined Capt. Straus at considerable length for the purpose of ascertaining the facts and circumstances under which the statement was made. All of the testimony adduced by the court's questioning, as well as that given upon direct and cross examination by counsel of this and other witnesses, disclosed that there were neither threats nor promises to induce the making of the statement; that there was no force, no promise of immunity, no representation of any kind. The testimony without exception discloses that the confession was entirely voluntary. Appellants have furnished us nothing in their arguments or briefs which would indicate any reason why the Palakiko statement was not properly received in evidence.

The same thing must be said of the statement made by Majors on March 24. Majors asked for the opportunity to make this statement to Capt. Straus. The trial judge, after the Territory had laid a foundation for the introduction of this statement, took over the questioning of the witness on the stand at the time the offer was made and inquired whether threats, promises or other unfair inducements were used in procuring this statement. There is no evidence whatever that the statement made by Majors on March 24 was not entirely voluntary. Palakiko was also present during that interrogation and was asked some questions also, including the query as to whether the statement then made by Majors was the "right story". Palakiko replied that it was.

█ The contention as to the improper inducements require consideration only as they relate to the first two of the three statements made by Majors. Although the complete record of the evidence, if it were before us, might disclose sufficient evidence apart from these earlier confessions to warrant conviction,[3] yet if the admission of these earlier confessions denied a constitutional right to Majors, the error would require reversal.[4] We must therefore examine the claim that Majors' first confession or second confession or both were received under circumstances of such irregularity and unfairness as to amount to a denial of due process.

Aside from the evidence that the first statement taken from Majors was begun about 10 hours after he had swallowed the iodine, and about 8 hours after the doctors had finished pumping out his stomach, and that he was then under the influence of barbiturates and in considerable pain, the circumstances which it is claimed rendered the receipt of these earlier confessions improper are to be found in the last portion of Majors' statement of March 24. That statement contained an account, through answers couched by Majors in his own words, covering the whole of what he had done from the time he and Palakiko escaped from the prison work gang. In this respect he told the same story that he had related in his first statement given on March 21 with the one exception to be noted hereafter. Near the conclusion of the statement, police Capt. Kennedy interrogated Majors as follows:

"Q. Jimmie, the other day at the hospital, you made an admission to Detective Vernal Stevens relative to your having, actually having sexual intercourse with Mrs. Wilder? A. Yes.

"Q. Can you explain the change in your story between that statement and this statement? A. Well, you ask Detective Stevens, he told me whether I tell 'yes' or whether I tell 'no', he still going charge

3. The case has been brought here upon a record which is limited to those matters deemed to have a bearing upon the admissibility of the confessions. Portions of this record indicate that when the defendants were apprehended they had with them or on their persons sundry articles tending to identify them as the persons who had entered the murdered woman's house.

4. See footnote 1, Lyons v. Oklahoma, 322 U.S. 596 at page 597, 64 S.Ct. 1208, 88 L.Ed. 1481.

that against me, and if I going tell 'no', I know when I come pau sick, I know going get licking. Nobody has to tell me that, I know. I might as well tell 'yes'. I like sleep there. Then when I get better, then I can tell you guys everything else.

"Q. Since being picked up in Kaneohe Saturday night, has anyone laid a hand on you or threatened you, strike you or beat you in any way? A. The only time I remember that when I was in the Queen's Hospital, Stevens said I had to something, I don't know what room he mentioned, we get the stuff.'"

Capt. Straus then resumed the interrogation, and after one question and answer not material here it proceeded as follows:

"Q. This morning I am talking about. Did you tell any policeman you want to talk to me? A. Yes.

"Q. Who's the policeman you told, you know? A. I don't know. Had one haole guy. The haole guy went call up.

"Q. Why did you want to talk to me? A. I know I was coming out of the hospital that day. Before I come in, sign the confession, before I made this one. I give the true story instead of the one I gave Stevens * * *.

"Q. Jimmie, the story you have told us here this morning, is that the true story? A. Yes.

"Q. And you make that story knowing that you weren't promised anything? A. Yes.

"Q. Did anybody promise you anything? A. In what way?

"Q. Promise you that we would go easy with you or promise to make things easy for you if you told us this story? A. Stevens told me if I tell everything, it be easy for me. I never care about that part, about easy, I just never like the idea of him telling me if I tell you, I going get charged.

"Q. I mean the story you told us here in this office this morning, that's a correct story? A. Yes.

"Q. And you weren't promised anything to tell us this story, were you? A. No.

"Q. And you told us this story voluntarily? A. Voluntarily, yes.

"Q. Because you wanted to tell us your story, is that correct? A. Yes.

"Q. As a matter of fact, you told the police officer to call up and get a hold of me because you wanted to tell me the story, is that correct? A. Yes."

Such self serving remarks as are included in that statement have no important significance here,[5] with the exception of the statement "Stevens told me if I tell everything, it be easy for me", for the reason that Officer Stevens testified that he did make such a statement: "Q. Did you tell him if he spoke it would be easier for him? A. I did." The appellant Majors' whole case hangs upon this bit of testimony, for the evidence adduced was all to the effect that there was no force or threats of force, no promises of immunity and no inducements of any kind, unless the statement just quoted can be so construed.

In order fully to understand the circumstances surrounding the making of this statement it is necessary to consider Majors' physical and mental condition at the time he made his March 21 statement. The hospital doctor in whose care Majors was at the time of his first statement, that given at 10:45 A.M. on March 21, testified that although Majors would then be sleepy from the barbiturates, as well as in pain from the iodine, he was sufficiently in possession of his faculties to be able to think and to talk.

But the best evidence of Majors' then mental condition is the statement itself. A reading of the transcribed questions and

5. The statement "I know going get licking", is not evidence of any threats of mistreatment, but even if it were, the Hawaiian courts have found that no such thing occurred. We would be inclined to think Majors' reference to a "licking" meant no more than that he knew he was about to suffer the consequences of a criminal prosecution.

answers discloses that Majors' account of what had transpired, was both logical and complete. The fact that in every particular, save the one previously mentioned, and hereafter described, the statement given on March 21 corresponded with that he made on March 24, after he had been discharged from the hospital, suggests that his mind was clear and his recollection good, when he gave the first confession. Although Majors phrased his answers in a patois, or what appears to be an Hawaiian version of pidgin English, with numbers of Hawaiian words interspersed, the expressive, and even vivid descriptions given disclose that Majors was both intelligent and alert.

The only substantial difference between these two statements of March 21 and March 24 was with respect to whether, in the assault on the woman, rape was accomplished, or only attempted. The first statement was incomplete on this matter. In the second statement of March 22, Majors said it was rape. That of March 24 described what would amount to an attempt only.

In accordance with the requirements of the Hawaiian statute,[6] the trial judge first received evidence as to the circumstances under which the confessions were made, all in the absence of the jury, and actively participated in the interrogation of the witnesses on this point. In admitting the confessions the court said: "It appears to the Court that the statements by their very wording appear to be voluntary. It further appears upon the evidence of witnesses taken that the statements were made voluntarily without hope of reward, promise of immunity, that affected the defendant in making a confession, or there were any threats or other violence to such an extent that defendant was intimidated and made the confession against his will. Referring to the excerpt from Prosecution's Exhibit 57 for Identification [statement of March 24] on page 27, the following statement appears: 'Q. Jimmy, the other day at the Hospital, you made an admission to Detective Ronald Stevens relative to your having, actually having, sexual intercourse with Mrs. Wilder. A. Yes. Q. Can you explain the change in your story between that statement and this statement? A. Well, you ask Detective Stevens, he told me whether I tell yes or whether I tell no, he still going charge that against me, and if I going tell no, I know when I pau sick I know I going get licking; nobody has to tell me that, I know; I might as well tell yes, I like sleep there, then when I get better then I can tell you guys everything else.' So far, upon the evidence, referring to that particular portion, the statement that he was to be charged whether he said 'Yes' or 'No' could not in my mind, be construed as a threat since it gave the defendant the opportunity of saying 'No' without incurring any other or different charge than if he said 'Yes'. There is no evidence before the Court that sustains the defendant's fear as to when he tells no when he is 'pau sick I know going get licking'; he doesn't say 'licking' by whom or why, nor does there, as far as the evidence shows, appear any ground for defendant's apprehension.

"Passing that statement for the time being and reverting to the statement upon page 28 of Prosecution's Exhibit 57, this appears: 'Q. Jimmy, the story you've told us here this morning, is that the true story? A. Yes. Q. And you make that story knowing that you weren't promised anything? A. Yes. Q. Did anybody promise you anything? A. In what way? Q. Promise you that it would go easy with you, or promise to make things easy for you, if you told him the story? A. Stevens told me if I tell everything it be easy for me, I never care about that part being easy.' Which to the Court's mind shows that the defendant was not influenced to make the confession by that statement even if it had been made to him,

---

6. R.L. Hawaii 1945, Title 25, C. 196, § 9846: "No confession shall be received in evidence unless it shall first be made to appear to the judge before whom the case is being tried that such confession was in fact voluntarily made and such voluntary confession, when offered in evidence on any trial, shall not be rejected merely because it was made on oath."

which is denied upon the evidence.[7] Continuing the quotation: 'Just never like the idea of him telling me, if I tell you yes or not I am going get charged anyway'; the Court has already held that that left the defendant freedom of choice."

In our opinion the findings and conclusions contained in the quoted ruling of the trial judge at the time of the admission of the confessions is fully justified by the record. This is not a case in which we deal with a conflict in evidence. Admittedly Officer Stevens made the quoted remarks to Majors at the time the latter made his earlier statement, but in Majors' statement of March 24, which is clearly in all respects voluntary, he said: "I never cared about that part; about easy, I just never like the idea of him telling me, if I tell you I go and get charged." But there was still a question of fact; that is, whether the statement of the officer had any effect upon Majors.

Upon the record here the trial judge has found, and we must assume the jury and the Supreme Court have also found as a fact that if the statement made to him by Stevens implied any promise, he, Majors, was at any rate not thereby induced to make his statements. In resolving this issue, the Hawaiian courts have in substance taken the same course as that described by the Supreme Court in Lisenba v. California, 314 U.S. 219, 238, 62 S.Ct. 280, 291, 86 L.Ed. 166, where, in speaking of cases in which the evidence as to how a confession was procured was conflicting, the court said: "There are cases, such as this one, where the evidence as to the methods employed to obtain a confession is conflicting, and in which, although denial of due process was not an issue in the trial, an issue has been resolved by court and jury which involves an answer to the due process question. In such a case we accept the determination of the triers of fact, unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process.

"Here judge and jury passed on the question whether the petitioner's confessions were freely and voluntarily made, and the tests applied in answering that question rendered the decision one that also answered the question whether the use of the confessions involved a denial of due process; this notwithstanding the issue submitted was not *eo nomine* one concerning due process. Furthermore, in passing on the petitioner's claim, the Supreme Court of the State found no violation of the Fourteenth Amendment. Our duty then is to determine whether the evidence requires that we set aside the finding of two courts and a jury and adjudge the admission of the confession so fundamentally unfair, so contrary to the common concept of ordered liberty as to amount to a taking of life without due process of law." [8]

We must note that our jurisdiction to review the action of the Hawaiian courts in holding the confessions admissible is a narrow one. We are not concerned with rules of evidence with respect to the required foundation for the admission of a confession. We are not empowered to say what those local rules of evidence in Hawaii should be.[9] The question is what standards of fundamental fairness in securing a confession are required by the Fifth Amendment, and whether those standards were here complied with. And in respect to that Amendment we note that the requirements are the same as those of the Fourteenth Amendment, of which it was said in Lyons v. Oklahoma, 322 U.S.

---

7. It is apparent that the court was mistaken in saying the statement was denied.

8. Cf. Watts v. Indiana, supra, 338 U.S. at page 52, 69 S.Ct. at page 1349, 93 L. Ed. 1801: "Therefore only those elements of the events and circumstances in which a confession was involved that are unquestioned in the State's version of what happened are relevant to the constitutional issue here."

9. Cf. Young v. Territory of Hawaii, 9 Cir., 160 F.2d 289; Fukunaga v. Territory of Hawaii, 9 Cir., 33 F.2d 396, certiorari denied 280 U.S. 593, 50 S.Ct. 39, 74 L.Ed. 641; Kimbrel v. Territory of Hawaii, 41 F.2d 740. See also Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L. Ed. 1492

596, 605, 64 S.Ct. 1208, 1213, 88 L.Ed. 1481. "The Fourteenth Amendment does not provide review of mere error in jury verdicts, even though the error concerns the voluntary character of a confession."

■ The difference between the tests to be applied to determine whether a confession is admissible under local rules of evidence, and those necessarily considered in an inquiry as to whether there has been disregard of due process, was set forth in Lisenba v. California, supra. There, speaking of the rules relating to admissibility as matter of state law, the court said, 314 U.S. at page 236, 62 S.Ct. at page 289, "The aim of the rule that a confession is inadmissible unless it was voluntarily made is to exclude false evidence. Tests are invoked to determine whether the inducement to speak was such that there is a fair risk the confession is false. These vary in the several states."

The propriety of the determination by the Supreme Court of Hawaii that the confessions in question met these tests cannot be questioned. At the very most we have here the statement by the officer that he told Majors "if he spoke it would be easier for him." There is no suggestion that Majors was advised to "confess" or that he tell what the officer wanted him to. This is no different, in substance, we think, than a suggestion that Majors tell the truth, or facts, or just what happened. A very substantial number of states have held that advice that "It would be better for you to tell the truth", is not such an inducement as to make a confession untrustworthy.[10] The Supreme Court of Hawaii might well agree with Mr. Wig-

more that "On principle, the advice by any person whatever that it would be better to tell *the truth* cannot possibly vitiate the confession, since by hypothesis the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession." [11] Indeed, even the limited record before us is sufficient to disclose, as to each confession, very strong "external proof of its verity." [12] Majors' first statement, as well as the last, described with minute detail the precise position in which he left the woman's undergarments, how she was bound, what he did with her false teeth when they fell out, how her glasses were broken, and where they were left. All these things, so described in such infinite detail as would be extremely unlikely for Majors to have read in or remembered from the newspaper accounts of the finding of the body, were found by the City and County pathologist when he went to the victim's home upon discovery of the crime.[13]

■ We put these considerations aside. We are not now passing upon the Hawaiian rule of evidence, but rather undertaking to determine whether "the application of that rule works a deprivation of the prisoner's life or liberty without due process of law. The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false." Lisenba v. California, supra, 314 U.S. at page 236, 62 S.Ct. at page 290, 86 L.Ed. 166.

■ When we apply that test here we cannot find any basis for concluding that

---

10. A considerable number of such cases are collected in Wigmore, Evidence, (3d Ed.) § 832, footnote 3.

11. Wigmore, Evidence, (3d Ed.) § 832.

12. Mr. Justice Jackson, concurring, in Watts v. Indiana, 338 U.S. 49, at page 60, 69 S.Ct. at page 1358, 93 L.Ed. 1801.

13. Thus the confessions relate how Majors and Palakiko repeatedly struck their victim on the jaw to quiet her, and later, when she started to regain consciousness and to "talk more loud", Majors, as he put it in his first statement, that of

March 21: "I told her for no make noise, she kept on making noise, I been hit her again. And by that time Palakiko was inside there already and Palakiko hit her two times on the chin." The doctor testified that "Examination of the lower jaw showed the jaw to be broken on both sides at least twice."

The undergarment received in evidence and discussed in the opinion of the Supreme Court (but not brought here) no doubt not only furnished external proof of verity, but proof as to which of the three statements was most accurate.

**62**

the three confessions were anything but voluntary in the sense that there was no disregard of the requirements of due process. Clearly, we think, they were "the expression of free choice". There appear here no inducing procedures which could be said to "violates the basic notions of our accusatorial mode of prosecuting crime".[14] We find nothing in the proven circumstances "revolting to the sense of justice",[15] or indicative of fraud or compulsion. None of the confessions were obtained by "lawless means,"[16] and there was no "fundamental unfairness"[17] in using them.[18]

■ The decisions of the Supreme Court to which reference has been made dealt with alleged disregard of the due process clause of the Fourteenth Amendment. The Fifth Amendment, here involved, contains, as the Fourteenth does not, the provision against self-incrimination. It has not always been clear as to whether the rule excluding involuntary confessions in part stems from the privilege against self-incrimination.[19] We find it unnecessary to consider that question for we hold that the court did not disregard the Fifth Amendment's provision against self-incrimination in receiving the confessions. Under the circumstances here shown, neither of the appellants has been "compelled * * * to be a witness against himself."

Affirmed.

---

14. Watts v. Indiana, supra, pages 53–55, 69 S.Ct. at pages 1350, 93 L.Ed. 1801.

15. Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682.

16. Chambers v. Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 84 L.Ed. 716.

17. Lisenba v. California, supra, 314 U.S. at p. 236, 62 S.Ct. 280, 86 L.Ed. 166.

18. In all the cases decided at the time of and prior to Watts v. Indiana, supra, (the prior cases are listed in note 3 at 338 U.S. at page 51, 69 S.Ct. 1347, 1357, 93 L.Ed. 1801), in which violation of due process was found, there was present some form of coercion which induced the confession. What is asserted here is that the statements challenged were procured by some promise. It may be that coercion is related to promises, as gall is to honey, but we think no distinction may be drawn between coercion, such as was found in the cases cited, and fraud, which is inherent in an inducing promise. As suggested in Lisenba v. California, supra, it is a question of "fundamental unfairness in the use of evidence."

19. See Wigmore, Evidence, 3d Ed. § 2266, and McCormick, "The Scope of Privilege in the Law of Evidence", 16 Texas L.Rev. 447.