Matter of the Application for a Writ of Habeas Corpus of Henry M. GRIFFITH, Petitioner,

v.

B. J. RHAY, as Superintendent of Washington State Penitentiary at Walla Walla, Washington, Respondent.

No. 1428.

United States District Court E. D. Washington, S. D.

Sept. 30, 1959.

R. Max Etter, Spokane, Wash., for petitioner.

John J. O'Connell, Atty. Gen., by Stephen C. Way, Asst. Atty. Gen., and Gordon Swyter, Pros. Atty. for Adams County, Ritzville, Wash., by Edward G. Cross, Deputy Pros. Atty., Ritzville, Wash., for respondent.

POWELL, Chief Judge.

Petition for a writ of habeas corpus has been filed by Henry M. Griffith, a prisoner under sentence of death, confined within this district in the Washington State Penitentiary at Walla Walla County, Washington. He was convicted of murder in the first degree in the County of Adams, State of Washington, by a jury verdict rendered on March 6, 1957.

On appeal to the Supreme Court of the State of Washington, judgment of conviction was affirmed on August 7, 1958.[1] All of the judges sitting concurred in the opinion. A petition for rehearing was denied on October 7, 1958.

Thereafter, the petitioner here filed a petition with the Superior Court of the State of Washington for Adams County, requesting review and claiming that he had been denied due process of law. The petition was denied. Subsequent thereto, and on May 25, 1959, the petitioner here filed a petition for writ of habeas corpus in the Supreme Court of the State of Washington. The petition was denied without hearing by the Supreme Court on the same date.

Petition for certiorari was filed in the United States Supreme Court. Certiorari was denied on June 1, 1959.[2]

Thereafter, and on July 16, 1959, the petitioner here filed a second petition for writ of habeas corpus in the Supreme Court of the State of Washington. The petition was denied on the same date.

Following the filing of the petition for writ of habeas corpus in this court, orders staying the execution of the petitioner were entered and the matter has now been submitted to this court for consideration upon the complete record of the trial, and the appeal to the Supreme Court of the State of Washington.

Petitioner has been authorized to proceed here in forma pauperis.

The court appointed R. Max Etter, a capable attorney of the Spokane Bar and former assistant attorney general of the state, to present the petition and argument on behalf of the petitioner in this court.

Counsel for the respondent moved to dismiss the petition in part, claiming that the petitioner failed to exhaust his remedies in the state courts. An examination of the petition for writ of habeas corpus filed in the Supreme Court of the State of Washington, and a comparison of that petition with the one filed in this court, disclose that all of the grounds for relief stated here were raised in the prior petition. Petitioner has therefore exhausted his remedies in the state courts as required by 28 U.S.C. §

1. State v. Griffith, 52 Wash.2d 721, 328 P.2d 897.

2. Griffith v. Rhay, 359 U.S. 1015, 79 S. Ct. 1156, 3 L.Ed.2d 1039.

2254, and is entitled to maintain his petition here. The motion to dismiss is accordingly denied.

■■ This court is required to determine the federal question presented here. The petition for writ of habeas corpus in this court is not a substitute for appeal.[3]

Petitioner contends that his constitutional rights were violated at the trial. The trial court admitted in evidence testimony concerning an oral statement, and also admitted an exhibit which was a statement signed by petitioner in which were admissions concerning his connection with the crime charged. He claims that the circumstances under which the statements were taken were such as to require their exclusion as being involuntary and coerced. He further contends that after the charge was filed against him he was not accorded rights guaranteed by the Fourteenth Amendment to the federal constitution, in that he was not immediately taken before a magistrate and was not given the benefit of counsel appointed by the court.

■ While the determination of the state court is not binding here, it is not to be disregarded. It is for this court to determine whether the petitioner has been accorded due process, or whether he has been denied rights guaranteed by the United States Constitution.[4] In the performance of that task there must be "an alert deference to the judgment of the state court * * *".[5]

The admitted facts are these: The petitioner was 19 years old when he was arrested. He had received little formal education. His childhood was unhappy and insecure. His stay in foster homes was necessary because his father abandoned the family and his mother suffered a nervous breakdown, requiring her hospitalization. He was in the army and went AWOL after boot training. He was sent to the state reformatory for forgery, and was on parole from that institution when he was arrested and charged with the crime of which he now stands convicted. The emotional instability of petitioner is shown by the testimony of his witnesses at the trial.

On October 6, 1956, at 11:30 p. m., petitioner was lying on a street in Spokane, Washington, suffering from a serious, self-inflicted, abdominal, gunshot wound. Police had orders to pick him up for questioning about the death of an oil dealer near Lind, Washington. The deputy sheriffs who found him proceeded to question him there and in the ambulance enroute to the hospital. Emergency surgery was performed. Repeated blood transfusions were given. From the record it appears the petitioner received medical and hospital care that left nothing wanting. His hospitalization extended from October 6, to December 31, 1956, during which time several major operations were performed on him.

During that period the petitioner was on two occasions questioned by officers. On October 7, 1956, a recorded interview was taken. A typed transcript of that interview was offered in evidence and rejected. On October 11, 1956, the prosecuting attorney of Adams County, in company with a stenographer and two detectives, interviewed the petitioner in his hospital room. He at that time had been charged with murder by an information filed in the Superior Court of Adams County. He was not represented by an attorney. He did not ask for an attorney. He had not been taken before a committing magistrate.

3. "The writ of habeas corpus in federal courts is not authorized for state prisoners at the discretion of the federal court. It is only authorized when a state prisoner is in custody in violation of the Constitution of the United States. 28 U.S.C. § 2241, 28 U.S.C.A. § 2241. That fact is not to be tested by the use of habeas corpus in lieu of an appeal." Brown v. Allen, 344 U.S. 443, at page 485, 73 S.Ct. 397, at page 421, 97 L.Ed. 469.

4. Brown v. Allen, 344 U.S. 443, 455, 488, 73 S.Ct. 397, 97 L.Ed. 469.

5. Malinski v. People of State of New York, 324 U.S. 401, 417, 65 S.Ct. 781, 789, 89 L.Ed. 1029.

At 2:25 p. m. on October 11, the nurse had administered to petitioner an injection of 75mgs. of demerol to relieve pain. Questioning of the petitioner began at 2:30 p. m. That interview was recorded and later typed and taken to the hospital by a notary on October 15, 1956. She found the petitioner in bed in a partially elevated position, smoking and reading. Petitioner was handed the statement to read and thereafter, under oath, signed it. The statement was received in evidence as the state's Exhibit 19. This statement, petitioner contends, should have, under all the circumstances, been rejected on the ground that it was coerced.

During the times referred to, the petitioner was a bed patient in the Sacred Heart Hospital in Spokane, Washington. He was not held incommunicado, although he was guarded. He had nurses in attendance frequently. His doctor saw him twice a day. He received visitors.

At the trial petitioner testified briefly, in the absence of the jury, concerning the questioning that resulted in his oral statement. He stated he had no recollection of it. He did not testify about the statements made on October 7 and 11, 1956, and did not take the stand in his own defense.

Petitioner was arraigned on January 4, 1957, before the Superior Court of Adams County, Washington, on the information filed against him there. No proceedings were conducted in court until an attorney had been appointed to represent him. Thereafter, he entered a plea of not guilty, and a special plea of not guilty by reason of insanity.

At the trial, evidence of the officers was received concerning the taking of the statements of petitioner. The record shows the State's evidence was introduced in the presence of the jury. No objection was made to this procedure by petitioner's trial counsel. The court instructed the jury on the weight to be given statements of petitioner.[5]

The petitioner's arraignment was delayed until his discharge from the hospital. Under the Washington statutes the appointment of counsel is to be made at the time of arraignment.[6]

■ Counsel for petitioner argues that the failure to arraign petitioner and to provide counsel for him, at an early date, has deprived him of his constitutional rights. Counsel must be provided to conduct the trial.[7] There is no

5. Instruction No. 17—"Admissions made by a defendant charged with crime, when such admissions are not caused by duress or fear produced by threats, are to be considered by the jury in connection with all the other evidence in the case in determining the guilt or innocence of the accused, and their weight, as evidence, like that of any other fact, is to be determined by you alone. If you find any such admissions have been made in this case, you have a right, in weighing such testimony, to consider all the facts and circumstances connected therewith, together with the defendant's interest, if any, in the transaction, and his knowledge, if any he had, of the circumstances, which may throw any light upon, or aid you in weighing such testimony."

6. RCW 10.40.010 "Time of [Arraignment]. When the indictment or information has been filed the defendant, if he has been arrested, or as soon thereafter as he may be, shall be arraigned thereon before the court."

RCW 10.40.030 "Counsel assigned to indigents. If the defendant appear without counsel, he shall be informed by the court that it is his right to have counsel before being arraigned, and he shall be asked if he desire the aid of counsel, and if it appear that he is unable to employ counsel by reason of poverty, counsel shall be assigned to him by the court."

RCW 10.01.110 "Counsel—Right to—Fees. Whenever a defendant shall be arraigned upon the charge that he has committed any felony, and shall request the court to appoint counsel to assist in his defense, and shall by his own oath or such other proof as may be required satisfy the court that he is unable, by reason of poverty, to procure counsel, the court shall appoint counsel, not exceeding two, for such defendant * * *"

7. "* * * We have many times repeated that not only does due process require that a defendant, on trial in a state court upon a serious criminal charge and unable to defend himself, shall have the bene-

such general requirement as to investigative stages.

■ An application for writ of habeas corpus following a state court conviction is to be treated differently from that following a federal court conviction. The

delay in arraignment and in appointment of counsel in a state court case are relevant only as they bear on petitioner's contention that he has been deprived of a fair trial, through the use of a coerced confession or otherwise.[8]

fit of counsel, compare Williams v. Kaiser, supra [323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398], Tomkins v. State of Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407 and Rice v. Olson, 324 U.S. 786, 65 S. Ct. 989 [89 L.Ed. 1367], with Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, but that it is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; Avery v. State of Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377; Ex parte Hawk, 321 U.S. 114, 115–116, 64 S.Ct. 448, 449, 88 L.Ed. 572; House v. Mayo, supra [324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739]." White v. Ragen, 324 U.S. 760, 763–764, 65 S.Ct. 978, 980, 89 L.Ed. 1348.

8. "The decision and judgment below determine for us that under the law of Nebraska such detention and examination, without appearance or arraignment, do not require exclusion of the confessions or plea as involuntary. The rule of the McNabb case, considered recently in United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48, is not a limitation imposed by the Due Process Clause. McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L. Ed. 819; Lyons v. State of Oklahoma, 322 U.S. 596, 597, note 2, 64 S.Ct. 1208, 1210, 88 L.Ed. 1481. Compliance with the McNabb rule is required in federal courts by this Court through its power of supervision over the procedure and practices of federal courts in the trial of criminal cases. That power over state criminal trials is not vested in this Court. A confession can be declared inadmissible in a state criminal trial by this Court only when the circumstances under which it is received violate those 'fundamental principles of liberty and justice' protected by the Fourteenth Amendment against infraction by any state." Gallegos v. State of Nebraska, 342 U.S. 55, 63–64, 72 S.Ct. 141, 146, 96 L.Ed. 86.

" * * * When this Court is asked to reverse a state court conviction as wanting in due process, illegal acts of

state officials prior to trial are relevant only as they bear on petitioner's contention that he has been deprived of a fair trial, either through the use of coerced confession or otherwise. Lisenba v. [People of State of] California, supra 314 U.S. [219] at pages 234, 235, 240, 62 S.Ct. [280, at pages] 289, 291, [86 L. Ed. 166] 235, 240; Lyons v. [State of] Oklahoma, supra 322 U.S. [596], at page 597, n. 2, 64 S.Ct. 1210; Gallegos v. [State of] Nebraska, 1951, 342 U.S. 55, 59, 65, 72 S.Ct. 141, 144, 147 [96 L. Ed. 86]. Upon the facts of this case, we cannot hold that the illegal conduct of the law enforcement officers in not taking petitioner promptly before a committing magistrate, coerced the confession which he made in the District Attorney's office or in any other way deprived him of a fair and impartial trial." Stroble v. State of California, 343 U.S. 181, at page 197, 72 S.Ct. 599, at page 607, 96 L.Ed. 872.

"To delay arraignment, meanwhile holding the suspect incommunicado, facilitates and usually accompanies use of 'third-degree' methods. Therefore, we regard such occurrences as relevant circumstantial evidence in the inquiry as to physical or psychological coercion. As such, it was received and the jury was instructed to consider it in this case. But the petitioners' contention here goes farther—it is that the delayed arraignment compelled the rejection of the confessions.

"Petitioners confuse the more rigid rule of exclusion which, in the exercise of our supervisory power, we have promulgated for federal courts with the more limited requirements of the Fourteenth Amendment. This, we have held, did not impose rules of evidence on state courts which bind them to exclude a confession because, without coercion, it was obtained while a prisoner was uncounseled and illegally detained. Stroble v. State of California, 343 U.S. 181, 197, 72 S.Ct. 599, 607, 96 L.Ed. 872; Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166." Stein v. People of State of New York, 346 U.S. 156, at pages 187, 188, 73 S.Ct. 1077, at page 1094, 97 L.Ed. 1522.

In Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448, the defendant repeatedly asked for, and was refused the right to, counsel. The defendant Crooker was educated and was well aware of his constitutional rights. After repeated questioning he finally confessed, and later claimed his confession was coerced. In rejecting his claim, the majority of the Court in that case said (357 U.S. at pages 437–438, 78 S.Ct. at page 1290):

"The bare fact of police 'detention and police examination in private of one in official state custody' does not render involuntary a confession by the one so detained. Brown v. Allen, 1953, 344 U.S. 443, 476, 73 S.Ct. 397, 417, 97 L.Ed. 469. Neither does an admonition by the police to tell the truth, Sparf v. United States, 1895, 156 U.S. 51, 55–56, 15 S.Ct. 273, 275, 39 L.Ed. 343, nor the failure of state authorities to comply with local statutes requiring that an accused promptly be brought before a magistrate. Fikes v. State of Alabama, 1957, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246.

"Petitioner's claim of coercion then, depends almost entirely on denial of his request to contact counsel. This Court has not previously had occasion to determine the character of a confession obtained after such a denial. But we have held that confessions made by indigent defendants prior to state appointment of counsel are not thereby rendered involuntary, even in prosecutions where conviction without counsel would violate due process under the Fourteenth Amendment. Brown v. Allen, 1953, 344 U.S. 443, 474–476, 73 S.Ct. 397, 416–417, 97 L.Ed. 469; Stroble v. State of California, 1952, 343 U.S. 181, 196–198, 72 S.Ct. 599, 606–607 [96 L.Ed. 872]; Gallegos v. State of Nebraska, 1951, 342 U.S. 55, 64–68, 72 S.Ct. 141, 147–149, 96 L.Ed. 86."

In this case petitioner at no time requested the services of an attorney prior to his appearance in court for arraignment. He was regularly visited by his mother and grandmother, and they were afforded opportunity to advise him. Furthermore, he was physically unable to appear in court for an early arraignment. The lack of counsel in the early stages of the case, as has heretofore been pointed out, is a circumstance to consider in determining if due process has been accorded. There is no evidence of the denial of any request by petitioner for counsel.

In the case of Cicenia v. Lagay, 357 U.S. 504, at page 509, et seq., 78 S.Ct. 1297, at page 1300, 2 L.Ed.2d 1523, the Court, concerning the right to counsel in criminal cases, states:

"The difficulties inherent in the problem require no extensive elaboration. Cf. Watts v. [State of] Indiana, 338 U.S. 49, 57–62, 69 S.Ct. 1347, 1351, 1359, 93 L.Ed. 1801 (opinion of Jackson, J.). On the one hand, it is indisputable that the right to counsel in criminal cases has a high place in our scheme of procedural safeguards. On the other hand, it can hardly be denied that adoption of petitioner's position would constrict state police activities in a manner that in many instances might impair their ability to solve difficult cases. A satisfactory formula for reconciling these competing concerns is not to be found in any broad pronouncement that one must yield to the other in all instances. Instead, as we point out in Crooker v. [State of] California, supra [357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448], this Court in judging whether state prosecutions meet the requirements of due process, has sought to achieve a proper accommodation by considering a defendant's lack of counsel one pertinent element in determining from all the circumstances whether a conviction was at-

tended by fundamental unfairness. See House v. Mayo, 324 U.S. 42, 45–46, 65 S.Ct. 517, 519–520, 89 L.Ed. 739; Payne v. [State of] Arkansas, 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975.

"In contrast, petitioner would have us hold that any state denial of a defendant's request to confer with counsel during police questioning violates due process, irrespective of the particular circumstances involved. Such a holding, in its ultimate reach, would mean that state police could not interrogate a suspect before giving him an opportunity to secure counsel. Even in federal prosecutions this Court has refrained from laying down any such inflexible rule. See McNabb v. United States, supra [318 U.S. 332, 63 S. Ct. 608, 87 L.Ed. 819]; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. * * *"

There is no claim that the statements of petitioner here were exacted by physical violence, threats, or inducements consisting of promises of immunity. Counsel for petitioner argues that the Spano case considered by the Supreme Court [9] is parallel to the one here under consideration. There, Spano, under indictment, and apparently in good health, was delivered into custody by his attorney who cautioned him to answer no questions. Thereafter, from 7:15 p. m. to 6:00 a. m. of the following day, he was repeatedly questioned, refused access to his attorney, and through sympathy for a friend on the police force (who falsely represented himself in trouble because of the defendant), was finally induced to make a confession.

Here, the petitioner Griffith was questioned when he was first arrested, and was immediately taken to a modern hospital. The hospital records, Defendant's Exhibit 20, show repeated calls on him by nurses and relatives. He was not threatened or subjected to prolonged questioning.

Petitioner, as has been previously noted, testified in the absence of the jury that he had no recollection of the officers first questioning him. While a faulty recollection may thwart cross-examination, it is hardly a refutation or explanation of the direct testimony of adverse witnesses.

The two officers present, William C. Seitz and Warren Adams, testified concerning petitioner's physical and mental condition when he was first arrested, that he was suffering pain, but that he was coherent and responded freely to questions asked.[10]

■ The petitioner contends that because the questioning by the prosecuting attorney, which resulted in State's Exhibit 19, was started five minutes after

9. Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265.

10. Officer Adams testified (ST 260):
"A. When I arrived he had one blanket over him. I got another blanket and put over him. I asked him how he felt. He said, not too bad. I said, are you in a great deal of pain. He said, no, it just burns. I checked the wound, and it wasn't bleeding too badly.
"Q. Did he respond to your questions freely? A. Yes, very freely.
"Q. Had he at any time become incoherent? A. No, he talked freely all the way while he was laying and waiting on the ambulance, and on the way to the hospital, and on the way to the hospital and when he got there in the hospital.

"Q. Do you believe, Officer Adams, at this time that the defendant was in his right mind? Was he absolutely all right to be answering questions of this nature? A. I definitely do. I believe he knew what he was saying, and although he was in pain, and he had to be in pain to receive a wound like that, but I firmly believe he knew what he was saying, and he was telling me the truth." (ST 270)
Officer Seitz testified (ST 272):
"Q. During the time that you were present at these questions, did you observe the condition of the defendant? A. Yes, I did.
"Q. Did he respond readily to the questions? A. Yes, he did.
"Q. Did he seem coherent? A. At the time, yes."

the injection of 75 mgs. of demerol, that statement was not a voluntary one. The doctor who treated the petitioner, Dr. Albi, testified at the trial concerning the nature and properties of demerol. In addition, two doctors testified at the hearing on the petition here under consideration. There is some conflict in the testimony.

Demerol is a narcotic drug. It is obtainable by prescription only. It is habit forming and patients build up a tolerance for it. It is an analgesic and a sedative, given to alleviate pain. Dosages range normally between 50 and 200 mgs. Its initial effect is felt in 5 to 15 minutes after injection; the maximum, in one-half to two hours; and no effects remain after three to three and one-half hours.

Dr. Albi in his testimony described it as being a narcotic and analgesic, and stated that the effects produced by it could be compared to those produced by intoxicants.[11]

The testimony further is that if he were affected by demerol to such an extent as to be unresponsive, petitioner would be sleepy, drowsy, and inattentive.

An examination of the statement, State's Exhibit 19, indicates that such was not the condition of petitioner. The length of questions and the nature of the answers would indicate that petitioner had possession of his faculties at the time the statement was taken.

Doctor Albi, though at first reluctant to do so, gave his consent, after a lapse of two or three days, to the officers to interview petitioner.[12]

In further testifying, the doctor stated "The doctor stated in his further testimony that if the answers to questions put to a person under the influence of demerol were normal and responsive, it would indicate that person retained his mental faculties.[13]

A similar problem was before the United States Court of Appeals for the Ninth Circuit in Palakiko v. Territory of Hawaii, 188 F.2d 54. The defendant there was given phenobarbital. A physician testified defendant would be sleepy, but would awaken at intervals and be able to think and talk. His confession, the court held, was not coerced when ob-

11. "A. Well, demerol is one of the class of drugs that is known as narcotic and analgesic. That means it would bring on sleep, and it will also stop pain. I think that is what the words would indicate.
"Q. Yes. Well, Doctor, how does demerol affect a person, or I will ask you how does demerol affect a person in the defendant's condition at that time? A. Well, I think it would tend to do away with anxiety. It would tend to relax one. It would tend to stop the pain." (ST 329.)
On cross-examination the doctor testified:
"Q. To get it into something a little more understandable, isn't it similar to drinking intoxicating liquor in varying degrees? A. I think it could be compared to that." (ST 451.)

12. "Q. As you recall, for the first two or three days after this first operation you disapproved of someone going in to take a statement from him, did you not? A. I believe so. I am not absolutely certain about this, but I asked him not to disturb him while his oxygen was going, and so forth.
"Q. By the way, after that two or three day period, I take it you don't remember the exact length? A. No.
"Q. And incidentally, you were contacted several times during those days? A. I think I was contacted twice.
"Q. Then after those two or three days you did give your approval, is that right? A. Yes, sir." (ST 454.)

13. "Q. I mean if their [persons under influence of drug such as demerol] answers were responsive, that would mean they were in possession of some of their faculties, wouldn't it? A. I should think so.
"Q. If they showed a good memory and were able to recall events more or less normally, that would indicate retention of their mental faculties? A. I would say if their responses sounded all right, I guess it would. That would be some indication that they were all right I guess." (ST 338.)

·tained during that period. Judge Pope stated at page 58, "But the best evidence of Majors' then mental condition is the statement itself."

The same case was again before the Court of Appeals in Palakiko v. Harper, 9 Cir., 209 F.2d 75. The statement of Majors was again held not the result of "psychological coercion."

Statements taken from prisoners who are intoxicated are not excluded as evidence.[14]

If the effect of demerol is comparable to intoxication, the statement here would appear to be admissible without question.

The trial court, without objection from petitioner's counsel, permitted the State's witnesses to testify to the circumstances of the taking of the two statements in the hospital. Generally, what is said here of the second statement which was admitted in evidence, applies to the first one, which the court rejected. The evidence does not show such conduct as to amount to coercion. The instruction on admissions, and the weight to be given them, would not be improved by asking the jury to pass on their character. It was the duty of the court, not the jury, to pass on their admissibility.

For the reasons given, the petition is denied.

---

14. "A confession otherwise voluntary is not to be excluded because the accused was intoxicated when he made it. The fact that the confesser was intoxicated is a circumstance affecting its credibility, and is to be considered by the jury. It is immaterial that the liquor was furnished to the confesser by the officer having him in custody.

"If the intoxication of the confesser produced actual mainia, or rendered the confesser unconscious of what he was saying, his confession is inadmissible. However, the fact that the accused had but recently recovered from delirium tremens will not render a confession inadmissible." 2 Wharton's Criminal Evidence 122, § 388 (12th Ed.)

"The trial court admitted testimony of a police officer concerning admissions made to him by appellant after his arrest. Its admissibility is challenged on the ground that when appellant was questioned 'he was nervous and jittery, was very much under the influence of liquor * * * the police did not at any time warn him whatever he said would be used against him, or even tell him that he was charged with any crime; and therefore he had no reason to think that he needed counsel.' These facts, assuming their correctness, did not render the admissions inadmissible. Even a confession, given under such circumstances, would have been admissible. The rules governing the reception in evidence of admissions are much less onerous than those concerning confessions. There was no reason for an instruction as to the difference between an admission and a confession." Morton v. United States, 79 U.S.App.D.C. 329, 147 F.2d 28, 31.