Henry M. GRIFFITH, Appellant,

v.

B. J. RHAY, as Superintendent of the Washington State Penitentiary at Walla Walla, Washington, Appellee.

No. 16705.

United States Court of Appeals
Ninth Circuit.

Sept. 12, 1960.

R. Max Etter, Spokane, Wash., for appellant.

John J. O'Connell, Atty. Gen., Stephen C. Way, Asst. Atty. Gen., Olympia, Wash., Gordon Swyter, Pros. Atty., Edward Cross, Deputy Pros. Atty., Ritzville, Wash., for appellee.

Before ORR, HAMLEY and HAMLIN, Circuit Judges.

HAMLEY, Circuit Judge.

Henry M. Griffith appeals from a district court order denying his application for a writ of habeas corpus. He is in the custody of the warden of Washington State Penitentiary under a death sentence following his conviction in the state court on a charge of murder in the first degree. The opinion of the district court is reported in 177 F.Supp. 386.

Griffith argues here that the district court erred in rejecting his contention that he was deprived of due process of law in the state trial court proceedings. Specifically, it is urged that the trial court should not have received in evidence a signed confession obtained while Griffith was assertedly under the influence of drugs, and while he was without the assistance of counsel. Question is also raised concerning the manner in which the jury was required to function in evaluating the weight to be accorded this confession and testimony relative to certain oral admissions.

 Griffith has not raised this latter question in any state court proceeding. Since he has failed to exhaust his state court remedies the district court and this court are without jurisdiction to grant relief on that ground, however meritorious it may be. See 28 U.S.C.A. § 2254.[1]

---

[1] This ground primarily involves the manner in which testimony favorable to appellant was kept from the jury, while that which was against him was given in their presence. The trial judge ruled that a signed confession and the testimony concerning certain oral admissions were admissible. The jury, however, was instructed that in evaluating the "admissions" it should "consider all the facts and circumstances" in connection with the making of the admissions. Since this was the only instruction given on this subject we take it that in using the word "admissions" the court intended to include the signed confession which had been held to be admissible. As a matter of fact the so-called oral "admissions," to be described below, really constituted oral confessions. They were not confined to a statement of incriminating circumstances but were, as the state attorney general has told us here, "admissions of guilt."

But while the jury was instructed to consider surrounding circumstances in appraising the admissions, only those facts favorable to the state's position that the admissions were voluntary were testified to in front of the jury. All of ap-

██ Concerning the questions raised with regard to the voluntariness of the signed confession and the lack of counsel at the time it was given Griffith has exhausted the remedies available in the courts of Washington. He did so by raising these questions in a petition for a writ of habeas corpus filed in the Washington Supreme Court on May 25, 1959. That petition was denied on the same day, without hearing, in an unreported order. The Supreme Court of the United States thereafter denied a petition for certiorari to review this order. Griffith v. Rhay, 359 U.S. 1015, 79 S.Ct. 1156, 3 L.Ed.2d 1039, rehearing denied, 360 U.S. 941, 79 S.Ct. 1464, 3 L.Ed.2d 1553.[2]

The evidence summarized below is relevant to the questions pertaining to the signed confession. On October 4, 1956, A. B. Davis of Lind, Washington, was shot to death in a field near that city under circumstances which indicated murder. A prompt investigation led to the giving of a state alarm for the apprehension of Griffith as the suspected murderer.

The district court opinion contains this statement concerning the background of Griffith, who was then nineteen years of age:

" * * * He had received little formal education. His childhood was unhappy and insecure. His stay in foster homes was necessary because his father abandoned the family and his mother suffered a nervous breakdown, requiring her hospitalization. He was in the army and went AWOL after boot training. He was sent to the state reformatory for forgery, and was on parole from that institution when he was arrested and charged with the crime of which he now stands convicted. The emotional instability of petitioner is shown by the testimony of his witnesses at the trial." [177 F.Supp. 388.]

Late on the night of October 6, 1956, two days after the murder, a man was found lying on the shoulder of a street in Spokane, Washington. He was suffering from a self-inflicted bullet wound in the abdomen. The Spokane County sheriff's office was notified. Deputy Sheriff Warren Adams and two other officers responded to the call. Adams identified the wounded man as Griffith. Griffith was taken by ambulance to Sacred Heart Hospital in Spokane.[3]

Upon his arrival at the hospital in the early morning of October 7 Griffith was bleeding and in critical condition. Emergency surgery requiring from three and one half to four hours was

pellant's evidence tending to show that the admissions were involuntary was received in the absence of the jury. Appellant questions how the jury could evaluate the admissions, having heard only the state's side of the evidence relating to voluntariness.

2. Griffith had previously raised the question as to the voluntariness of the confession but not as to lack of counsel in his appeal to the Washington Supreme Court from the judgment of conviction. The question was decided against him. State v. Griffith, 52 Wash.2d 721, 328 P. 2d 897, 901. But since Griffith did not thereafter apply for a writ of certiorari to review that decision it did not operate to exhaust Griffith's state remedies even with regard to the limited confession question there submitted. See Darr v. Burford, 339 U.S. 200, 214–219, 70 S.Ct. 587, 94 L.Ed. 761.

Griffith filed a second petition for a writ of habeas corpus in the Washington Supreme Court on July 16, 1959. This petition was also denied in an unreported opinion on the day it was filed. But this petition did not raise any question which Griffith here presents, and in any event certiorari was not applied for. Hence this second state habeas corpus proceeding is also without significance on the question of exhaustion of state remedies.

3. Over objection Adams and another officer were permitted to testify at the state trial concerning certain incriminating oral admissions or confessions made by Griffith while he was lying on the ground and later while he was being taken to the hospital.

performed. Griffith remained in a critical condition all of that day.

According to the testimony of Dr. William Albi who performed the operation, Griffith was in a "stuporous" condition the remainder of that day but he could feel pain. A catheter had been placed in his bladder to keep it drained. A tube had been placed in his nose to empty stomach secretions. Oxygen was administered, he received a transfusion of five pints of blood, and food was given intravenously using the arms alternately. He was also under sedation, as described below.[4]

Griffith did not progress rapidly after the operation. Dr. Albi testified that his condition probably "regressed." Four additional serious operations were required, the first of these on October 24, 1956, and the last on December 2, 1956. According to the hospital report, one of these operations, which was for the removal of a kidney, was performed "because of the recurrent and steady loss of blood which kept the patient's condition constantly at low tide, seriously affecting his vitality, thinking and power to recuperate."

To relieve pain following the operation a narcotic and analgesic drug known as demerol was administered from time to time. Except for an initial dose of 100 mgms, dosages of 75 mgms were given between October 7 and 15, 1956, as indicated in the margin.[5]

The initial effect of demerol is felt in five to fifteen minutes after injection, the maximum in one-half to two hours. No effect remains after three to three and one-half hours. The medical testimony concerning the effect these dosages of demerol had on Griffith is dealt with below.

While at the hospital Griffith was guarded but not held incommunicado. He had nurses in attendance frequently. His doctor saw him twice a day. He was often visited by his mother and grandmother who were afforded the opportunity to advise him. At no time during this period did he have or request to have the services of an attorney. An information charging Griffith with the crime of murder in the first degree was filed against him on October 8, 1956.

The oral statements which were thereafter typed, signed and received in evidence as a confession were made by Griffith on the afternoon of October 11, 1956. At 3:00 o'clock that morning Griffith had been given 75 mgms of demerol to

---

4. Notwithstanding what Dr. Albi described as Griffith's "desperate" illness on that day, he was interrogated that afternoon, with the permission of the doctor, by a deputy sheriff using a wire recorder. The purported confession then obtained, a transcription of which was signed by Griffith two days later, was offered in evidence at the state trial, but was rejected by the court.

---

5. Medication: Demerol

| 10– 7–56: | 1:00 A.M. | 10– 8–56: | 4:30 A.M. | 10– 9–56: | 12:15 A.M. |
| | 7:00 A.M. | | | | 5:00 P.M. |
| | 9:45 A.M. | | | | 11:00 A.M. |
| | 1:30 P.M. | | | | 10:00 P.M. |
| | 5:15 P.M. | | | | |
| | 9:00 P.M. | | | | |
| 10–10–56: | 6:10 A.M. | 10–11–56: | 3:00 A.M. | 10–12–56: | 12:35 A.M. |
| | 12:10 P.M. | | 2:25 P.M. | | 6:30 A.M. |
| | 9:00 P.M. | | 6:10 P.M. | | 11:10 A.M. |
| | | | 9:00 P.M. | | 3:15 P.M. |
| | | | | | 9:30 P.M. |
| 10–13–56: | 6:15 A.M. | 10–14–56: | 1:00 A.M. | 10–15–56: | 6:45 A.M. |
| | 12:30 P.M. | | 5:30 A.M. | | 11:40 A.M. |
| | 4:30 P.M. | | 10:30 A.M. | | 4:15 P.M. |
| | 8:30 P.M. | | 8:50 P.M. | | 9:30 P.M. |

relieve lower abdominal pains. All of the tubes and attachments had been removed from Griffith except the tube which was necessary to continue intravenous feeding. It was noted on his hospital record that Griffith was having a "good day." However, a few minutes after 2:00 p. m. he again complained of abdominal pains. Before a further dosage of demerol could be given, the prosecuting attorney of Adams County in company with a stenographer and two detectives from the sheriff's office entered Griffith's hospital room, with the permission of the doctor, for the purpose of interviewing him. Before the questioning got underway, however, the nurse on duty asked them to step out of the room while she gave Griffith another 75 mgms of demerol. Five minutes later the questioning began.

The evidence is in dispute as to Griffith's condition at just this time. The nurse testified that he seemed drowsy, in quite a bit of pain, and "not real alert." Asked if Griffith responded to her questions the nurse stated, "Henry would shake his head and maybe say yes or no. He wouldn't answer long sentences. * * * If you said how do you feel, Henry, and maybe shook him he would respond in some way."

Detective James D. Allen, who was present during the interrogation on that day, testified that Griffith was coherent and readily answered questions. Adams testified that Griffith's answers were responsive, and he was evidently aware of

his surroundings and what was taking place. The stenographer testified to the same effect.

At the outset of the questioning the prosecuting attorney identified himself to Griffith, told Griffith that he was charged with murder in the first degree, and warned him that anything he said could be used against him. Griffith, however, was not told that he did not have to answer. Nor was he asked if he had an attorney or wished to consult an attorney, or advised that one would be provided without expense to himself if desired. Griffith did not request the services of an attorney.

A stenographic record of the interrogation was made. After being transcribed the written statement was taken to the hospital on October 15 by a notary public employed by the sheriff's office. She found Griffith in bed in a partially elevated position, smoking and reading. He was handed the statement to read and thereafter under oath signed it.

This written statement received in evidence over objection as state's exhibit 19 purports to be a complete confession of the crime, numerous details being given.[6] The answers given by Griffith, as recorded in this statement, appear to be responsive to the questions and no lack of coherence is apparent. Griffith could not recall certain details. In response to seven different questions he said "I don't know," or words to that effect. This inability to recollect some details, however, may not have been

6. When the state trial court ruled on this matter it had before it in addition to the evidence summarized above the testimony of Dr. Albi, referred to below, concerning the effect of demerol upon the mental powers and will of one under its influence. In holding that this signed confession was admissible (after excluding the previous signed confession on the ground that it was taken while Griffith was under the influence of demerol) the court said in part:

"Here the Prosecuting Attorney of Adams County was present, and an experienced man in taking confessions and statements of this nature. It is certain that he would not high pressure the man

or do anything that was out of order in connection with taking this deposition. On the morning of the 11th he had no medication at all."

As previously noted, Griffith had not only been given 75 mgms of demerol at 3:00 o'clock that morning, but had been given a similar dose just five minutes before the questioning began. The prosecuting attorney of whom the trial judge spoke was not a witness but was actively in charge of the state's case at the trial. It was he who had offered in evidence the earlier signed confession which the court rejected because Griffith was "under the influence of opiates."

caused by the demerol or Griffith's physical condition.

Three doctors testified as to the effect of demerol upon the ability of one, and especially a person in Griffith's then condition, to give a voluntary and reliable confession. One of these was Dr. Albi who testified at the state trial. The other two were Dr. H. M. Rodney and Dr. O. Charles Olson who testified at the district court hearing in this habeas corpus proceeding.

For the most part the doctors seemed to be in agreement that the reliability of Griffith's hospital confession was not affected by the fact that demerol had been administered a few minutes before. The doctors, however, were in sharp dispute as to whether under these circumstances one would be able to exercise his free will in deciding to give or to refrain from giving any statement.

Dr. Albi stated that one under the influence of demerol would be relieved of anxiety and would care less about what was going on. In his view demerol would make one sleepy and the "mind might be clouded." He expressed the opinion, however, that if one appeared to be alert, responded readily to questions, and displayed a good memory, that would indicate that he was not too much under the influence of the drug.

Dr. Olson testified that demerol induces a state of euphoria, which is a sense of well-being and happiness. In his opinion, however, use of the drug does not result in loss of volition. Nor does it, Dr. Olson testified, produce stupefaction or a hypnotic effect, and would not have affected the will of one in Griffith's circumstances. Dr. Olson apparently based this opinion to a considerable extent upon his examination of the confession. He pointed out that "it's coherent, it's intelligible, there were no lapses of consciousness apparent. He answered his questions directly and it appeared to me from reading the text that the man knew what he was talking about."

Dr. Rodney testified that the will of one under the influence of demerol is substantially impaired. It was his opinion that the general effect of this drug is more pronounced on a person weakened by injuries, and that psychopathic instincts are greatly accentuated by narcotics. Dr. Rodney also testified that a person under the effect of demerol would not have the mental acuteness and stability of a normal person.

The only part of the evidence summarized above which was testified to in the habeas corpus proceedings is that consisting of the testimony of Dr. Rodney and Dr. Olson. All of the remaining evidence was before the district judge in the form of the transcribed record of the state criminal trial and the exhibits received at that trial. On the basis of all the oral and transcribed evidence the district court found that Griffith "was in full possession of his faculties at the time the statement of October 11, 1956, was taken."

The district court concluded that the earlier oral admissions and the signed confession which had been admitted into evidence "were the result of his free and voluntary act and were not obtained through the use of coercion, either physical or mental, or inducements consisting of promises of immunity, or duress, contrary to the due-process clause of the 14th Amendment * * *." The district court further concluded that Griffith was not deprived of due process of law by reason of the fact that he did not have an attorney to represent him prior to his arraignment by the trial court.

Appellant challenges the finding of fact and conclusion of law concerning the voluntary character of the signed confession. He also questions the conclusion of law with regard to the lack of legal assistance.

We turn to this second question. This being a capital case, the Due Process clause of the 14th Amendment accorded Griffith the right to the assistance of counsel in the state proceedings. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. The precise question is whether under that constitutional principle Griffith was entitled to

the assistance of counsel at the time he was interrogated in the hospital room, and if so whether that right was denied to him.

In Crooker v. State of California, 357 U.S. 433, 438–440, 78 S.Ct. 1287, 1292, 2 L.Ed. 1418, it was held that apart from the question of the voluntariness of a confession state refusal of a request to engage counsel violates due process

"* * * not only if the accused is deprived of counsel at trial on the merits, Chandler v. Fretag, supra [348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4], but also if he is deprived of counsel for any part of the pre-trial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.' Lisenba v. People of State of California, 1941, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166. Cf. Moore v. State of Michigan, 1957, 355 U.S. 155, 160, 78 S.Ct. 191, 194, 2 L.Ed. 2d 167. The latter determination necessarily depends upon all the circumstances of the case."

■ In our opinion Griffith was so prejudiced by not having the advice of counsel on the afternoon of October 11, 1956. No one told him at that time that he did not have to submit to interrogation. There is no testimony that he had previously been given this information. Considering his youth and background, it could not reasonably be inferred that Griffith understood that he had the right to remain silent.

Had he been represented by an attorney on that occasion Griffith would without doubt have been advised that he need not talk. In view of his physical condition, the possible effect of the demerol, and the seriousness of the charge and penalty, such an attorney would probably also have advised him to refuse to talk.[7] Considering the character of the statement Griffith gave to the officers, it is our opinion that his failure to have that advice infected his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice." Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166.

In Crooker this test was applied but a contrary result was reached, due to the different circumstances of that case. Crooker was thirty-one years of age and a college graduate who had attended the first year of law school. On these facts the Supreme Court concluded that he "knew of his right to keep silent." As before stated, no such conclusion is warranted in our case. In Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523, while the defendant was denied access to his attorney during the period of his questioning he had previously employed counsel and was presumably advised of his rights.

The rule announced in Crooker refers to circumstances in which a defendant has requested counsel and such request has been refused. In our opinion, however, Griffith is to be regarded as in the same position as one who had made and been denied such a request.

■■ Since Griffith had a right to the assistance of counsel on the afternoon of the interrogation, his failure to request such assistance has significance only if it amounted to a waiver of that right. But a waiver is an intentional relinquishment or abandonment of a known right or privilege. A waiver cannot be effected unless it is intelligently and competently given. Moreover, courts indulge every reasonable presumption against the waiver of fundamental constitutional rights. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461.

7. As Justice Jackson said, concurring in Watts v. State of Indiana, 338 U.S. 49, 58, 69 S.Ct. 1347, 1357, 1358, 93 L.Ed. 1801: "Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances."

■ There is nothing in this record to indicate that Griffith knew that he had the right to the assistance of counsel on the afternoon in question. It follows that there is no support for a finding or conclusion that his failure to request counsel constituted a waiver of a known right. In addition the circumstances strongly indicate that even if Griffith then knew of his right to the assistance of counsel he was not in a physical and mental condition which would enable him to intelligently and competently waive that right. We so conclude and do so entirely apart from the question of whether he was then able to give a voluntary confession.[8]

■ We hold that under the circumstances of this case the reception in evidence of a signed confession based on

questioning conducted while Griffith was without the assistance of counsel and at a time when he had not declined such assistance, deprived him of due process of law within the meaning of the 14th Amendment. In the light of this holding the fact that the record contains other evidence of guilt which may be considered overwhelming is immaterial. See Malinski v. People of State of New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029.[9]

The judgment is reversed and the cause is remanded with directions to accord the courts of the State of Washington a reasonable opportunity to retry Griffith, in the event of which the writ of habeas corpus shall be denied. Otherwise, it is to be granted. The district court shall enter an appropriate order further staying the execution.

8. In Evans v. Rives, 75 U.S.App.D.C. 242, 126 F.2d 633, 639, it was specifically held that in view of Johnson v. Zerbst failure to request counsel does not give rise to an inference of waiver.

9. We need not decide whether apart from such circumstances Griffith was in any event entitled to counsel at the time because the information charging murder had already been filed against him. See the concurring opinions in Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. Nor need we decide whether the finding and conclusion that the confession of October 11, 1956, was voluntarily given is clearly erroneous and contrary to law.