STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN WADE, DEFENDANT, AND NATHANIEL WADE, DEFENDANT-APPELLANT.

Argued January 22, 1963—Decided May 6, 1963.

*Mr. Jacob L. Bernstein,* attorney, argued the cause for defendant-appellant (*Mr. J. Theodore Abrams,* on the brief).

*Mr. Archibald Kreiger,* Assistant Prosecutor of Passaic County, argued the cause for plaintiff-respondent (*Mr. John G. Thevos,* Prosecutor of Passaic County, attorney).

The opinion of the court was delivered by

SCHETTINO, J. Appellant, Nathaniel Wade, was convicted of first degree murder, with a recommendation of life imprisonment, and appeals as of right. The State charged that the Wade brothers, John and Nathaniel, drove from Connecticut to Paterson on March 3, 1960, to meet James Knox, with whom they planned the robbery of Harry Eckstein, a tavern owner. In the course of the robbery, the tavern owner was shot and killed by John Wade.

The Wades were leaving New Jersey when police began pursuing their car. Their car crashed into a retaining wall at the George Washington Bridge and they abandoned it. The pursuing police shot John in the leg. Nathaniel suffered multiple fractures of the right leg in a leap from a wall. Both were immediately apprehended and taken to a New York hospital. On March 8 John waived extradition, and Nathaniel followed suit on March 22.

The Wades and their alleged coconspirator, Knox, were initially held together, but the State moved to try Knox separately. The joint trial of the Wades resulted in life sentences for both. Knox, tried later as the "finger-man," was acquitted.

Only Nathaniel Wade appealed. He alleges as error: (1) that his confession, admitted into evidence, was involuntarily made while under the influences of a demerol injection administered to alleviate pains in his leg; (2) that the trial court did not charge the jury on second degree murder and manslaughter with respect to appellant, as it did with respect to John Wade; and (3) that the prosecutor, in his summation, misused appellant's prior criminal record.

I.

We first take up the contention that the trial court erred in admitting into evidence the confession of Nathaniel Wade, taken on March 22, because his will was "overborne" and his capacity for self-determination "critically impaired" by the injection of demerol about two hours before he confessed and

about four hours before he signed the statement. This, it is asserted, offended due process by violating the constitutional requirement of fundamental fairness, recently reaffirmed in *State v. Driver*, 38 *N. J.* 255 (1962) ; *State v. Fauntleroy*, 36 *N. J.* 379 (1962) ; and *State v. Smith*, 32 *N. J.* 501 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961).

According to Nathaniel Wade's testimony of the events of March 22, Detective Lawless of the Paterson police arrived at the New York hospital that morning and carried appellant to a waiting police car. Detective Neeson and two other police officers were present and assisted Detective Lawless. Appellant complained to the latter that his leg was in pain and that his left arm was paralyzed, and he asked for medical attention. The police officers then drove appellant to a police station on Centre Street in New York City. There he was placed in a wheel chair and carried into the building. He was fingerprinted and photographed. Wade stated that he had chills and was in pain and again asked for medical attention. The officers informed him that they were going through extradition proceedings and that when they had finished he would be placed in a hospital in Paterson. Wade continued to complain during the hour and a half he remained at the Centre Street building. He did testify, however, that Detective Neeson assisted him as best he could. In fact, on cross-examination, appellant testified that the officers treated him very kindly and handled him very carefully because they were concerned about his leg, and that no one had abused him in any way.

Wade was informed that next they were going to court to complete the extradition proceedings. He expressed reluctance to sign any waiver and asked to call his lawyer. One of the officers got Mr. Morley, Wade's New Jersey attorney, on the telephone. Mr. Morley advised Wade to waive extradition.

Appellant, as at all times that day, was then assisted from the building and into a waiting car and driven to a criminal

court. Still in pain and still suffering from chills, Wade was wheeled into court. It was then about two o'clock and court was not in session. Wade had not had lunch and he asked two of the officers who were going to the cafeteria to bring him some food. He was informed that he would eat after the extradition proceedings were completed. Wade appeared before a magistrate and then was taken to the eleventh floor to the court of special sessions, where he signed the necessary papers.

Thereafter, appellant was driven to the Paterson police headquarters. Upon his arrival, Wade testified that he reminded the officers that they had promised to get him medical attention and they replied that they would see about it. Wade was then taken to the third floor, removed from a wheel chair and placed on a desk chair. Wade's wife and a friend, William Jones, were in the room and they talked together for a short while. Then, as the result of a police call, Doctor Schmidt arrived from a hospital. Wade informed him of pain in his leg and stomach, chills and paralysis of his left arm. According to Wade's testimony, Detective Lawless mentioned demerol, and Detective Neeson suggested that Wade be given "a big bang of it" because his leg was broken in thirteen places. The doctor injected a hypodermic needle into Wade's left arm.

Appellant said that this relieved the pain but that within 10 or 15 minutes it put him "in a fog." Wade's wife and Mr. Jones continued to talk to him, but he claims he could not understand what they were saying. After they left, Detectives Lawless and Neeson spoke to Wade, but he could not understand them either. Then he noticed that Mr. Morley was present. Morley asked Wade how he felt and the latter replied, "very bad." The only other thing he remembered about Morley's visit was that he filled his pipe with tobacco and departed.

Appellant also testified that after Morley left, Detectives Lawless and Neeson had Wade moved to a little side room. Appellant was gagging and the officers suggested that he eat

a sandwich to stop it. Wade told them he had no desire for food, so they suggested he drink some Coca Cola. He did and threw it up.

Detective Neeson then sat behind a typewriter and Detective Lawless picked up some papers and told appellant they had some questions to ask of him. Wade testified that he was dizzy and in a fog and told the officers that he preferred not to answer any questions at that time. They insisted and put questions to appellant. He stated that he did not know or understand what they were saying, nor did he recall reading, correcting, initialing or signing any papers at this inquiry. He merely remembered that he was sick to his stomach, that his arm was paralyzed, and that his leg was again in pain. He also vaguely remembered being taken by the two detectives to a cell and given a cup of water and a large white pill to swallow.

The next thing Wade recalled was Detective Neeson's awakening him the following morning. He said he was still nauseous and in a fog. Neeson asked him to sign a paper so that a photographer could take Wade's picture. A picture was taken.

In connection with the issue of voluntariness, appellant called Dr. Schmidt. He testified that on March 22, 1960, he was summoned to the Detective Bureau in the Paterson police station. There he saw Nathaniel Wade, his leg in a cast. Wade complained of pain, which seemed to be confirmed by the expression on his face. Doctor Schmidt injected 100 milligrams of demerol into Wade's arm and left a sleeping pill for his use. Two detectives and Mrs. Wade were present at that time. Doctor Schmidt was in the Detective Bureau about 10 minutes all told.

Doctor Schmidt described demerol as a synthetic analgesic which acts as a sedative, an energetic and a spasmoltic. He said the drug takes effect soon after the injection and the effect lasts for about four hours. However, Doctor Schmidt could not say what effect it had on the mental processes of Wade because the reaction differs with each person. Pressed

further, the doctor testified that, in light of the dosage administered and Wade's size, he did not think it would have affected Wade to a considerable extent. He did say that if a person is not in pain, such as one being prepared for surgery, demerol has a marked sedative effect, whereas if a person is in pain, with its attendant state of tension and apprehension, demerol has a sedative effect which calms the person down to a level that might be considered normal. When asked whether demerol occasionally produces euphoria, Doctor Schmidt replied that that was rare. He admitted that ambulatory patients may become dizzy after receiving a dose of demerol and that there are some persons who react by vomiting or becoming nauseous, but on cross-examination, Doctor Schmidt said that these side effects, if they occur, usually take place twenty minutes to an hour after the injection.

The defense also called Mary Wade, appellant's wife. She testified that she arrived at the police station with William Jones before Nathaniel. When the latter arrived, Mrs. Wade and Mr. Jones talked to him, and according to Mrs. Wade, Nathaniel complained of pain and seemed in a daze. She testified that a doctor arrived and injected a needle into Wade's arm. Mrs. Wade and Jones remained after the doctor left to talk to appellant but the latter made no sense in his conversation with her. Mrs. Wade and Jones departed before Morley arrived.

Neither Mr. Jones nor Mr. Morley was called to testify. Compare *State v. Clawans,* 38 *N. J.* 162, 170–175 (1962), on the failure of a party to call a witness.

The version of events leading up to and surrounding Wade's confession, as testified to by Detectives Lawless and Neeson, differs somewhat from appellant's version. The detectives arrived at the New York hospital about 9 :20 A. M. They took Wade to a police station for photographing and fingerprinting and remained there until about 1 P. M. While there, Wade was given lunch. Wade also requested that he be allowed to call his attorney, which request was granted. The detectives then took Wade to felony court where he was arraigned at

2:15. From there Wade was taken to the court of special sessions on the eleventh floor of the same building. They waited there until 3:45 P. M., at which time Wade waived extradition. The detectives and Wade arrived at the Paterson police station at 5 P. M. and Wade was booked soon after. At 5:10 P. M. Mrs. Wade and Mr. Jones were allowed to visit with appellant on the third floor and remained with him until 6:30. Wade was given dinner at 5:20.

The detectives testified that throughout the day Wade complained that he was uncomfortable, not that he was in pain. When they arrived in Paterson they asked him if he wanted a doctor. Complying with his request, Doctor Schmidt was summoned from Paterson General Hospital. He arrived about 5:35, administered the injection and departed within 10 minutes, leaving a sleeping pill with Neeson. Thereafter Mrs. Wade and Jones were observed in normal conversation with Wade. At 6:35, five minutes after Wade's visitors departed, Mr. Morley arrived and engaged in private conversation with Wade until 7:05.

Right after Mr. Morley left, the two detectives asked Wade of he wished to give them a formal statement. He agreed. The taking of Wade's confession began at 7:12 and concluded at 9:07 P. M. Lawless asked the questions; Neeson typed the answers. They testified that Wade's condition throughout the day remained unchanged, that before and after the injection he appeared normal and spoke coherently. Lawless did testify, however, that while they were taking his statement, Wade said he felt more at ease. Wade read the statement for about 25 minutes, made some corrections, initialed the sheets and signed the last page at 9:25 P. M. The detectives testified that during the taking of his confession Wade did not complain that he was nauseous or dizzy, nor did he vomit. They testified that he had a coke before they began and was allowed to interrupt his recital once for another coke and a candy break.

Wade was put in a cell at 9:40 and given the sleeping pill by Neeson. Both detectives next saw Wade in his cell the

following morning. Lawless denied that Wade then signed a paper, and neither detective could remember Wade's being photographed in the cell, although Neeson testified that Wade was photographed later that morning in the station photograph room.

Confessions are competent evidence, in a constitutional sense, only when voluntarily made. While all relevant circumstances must be considered by the trial court in determining its admissibility, the ultimate question is whether the defendant's will was overborne and his capacity for self-determination seriously impaired. *Culombe v. Connecticut*, 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 1879, 6 *L. Ed.* 2d 1037, 1057–1058 (1961). This test governs regardless of the method of coercion, be it physical violence or psychological pressure, and is "equally applicable to a drug-induced statement." *Townsend v. Sain*, 372 *U. S.* 293, 83 *S. Ct.* 745, 754, 9 *L. Ed.* 2d 770, 782 (1963).

Appellant makes no charge of police brutality; on the contrary, he testified that the police were solicitous of his physical condition. The pain he was suffering, even if severe and present when he gave his statement, would not of itself render the confession involuntary. *State v. Wise*, 19 *N. J.* 59, 95 (1955). However, the evidence eliminated pain as a major factor to be considered in the totality of circumstances because of the demerol injection at least an hour and a half before appellant began answering the detectives' questions. Nor is there any evidence that Wade was coerced with promises of medical aid, or that he underwent prolonged interrogation. Thus, the issue of voluntariness is reduced to a question of whether the demerol injection deprived Wade "of a rational intellect and a free will." *Blackburn v. Alabama*, 361 *U. S.* 199, 208, 80 *S. Ct.* 274, 280–281, 4 *L. Ed.* 2d 242, 249 (1960).

A confession made by a person while under the influence of drugs is not *per se* involuntary. *State v. Wise, supra*, 19 *N. J.*, at *pp.* 85–92. This view is well established in those jurisdictions that have had an opportunity to pass

upon the question. See, *e. g., Griffith v. Rhay*, 282 *F. 2d* 711 (9 *Cir.* 1960), *cert.* denied 364 *U. S.* 941, 81 *S. Ct.* 460, 5 *L. Ed. 2d* 373 (1961); *People v. Cobb*, 45 *Cal. 2d* 158, 287 *P. 2d* 752 (*Sup. Ct.* 1955); *People v. Townsend*, 11 *Ill. 2d* 30, 141 *N. E. 2d* 729, 69 *A. L. R. 2d* 371 (*Sup. Ct.* 1957), *cert.* denied 355 *U. S.* 850, 78 *S. Ct.* 76, 2 *L. Ed. 2d* 60 (1957); *State v. Anderson*, 247 *Minn.* 469, 78 *N. W. 2d* 320 (*Sup. Ct.* 1956); *People v. Kent*, 41 *Misc.* 191, 83 *N. Y. S.* 948 (*Sup. Ct.* 1903); *Dickey v. State*, 162 *Tex. Cr. R.* 322, 284 *S. W. 2d* 901 (1955); *Orange v. Commonwealth*, 191 *Va.* 423, 61 *S. E. 2d* 267 (*Sup. Ct. App.* 1950); see generally Annot., 69 *A. L. R. 2d* 384 (1960).

The State did not contest the testimony of Doctor Schmidt that Wade was probably under the influence of the demerol injection for about four hours. The sharp conflict of testimony exists as to the effect of the demerol injection on Wade; he claimed he was nauseous, dizzy and "in a fog" and did not know what he was doing; the detectives testified that he appeared normal and spoke coherently. Doctor Schmidt could not testify as to the effect of the injection on Wade but was of the opinion that, although the reaction may differ with the person, it probably had little effect on Wade. Compare the testimony regarding the effects of demerol in *Griffith v. Rhay, supra,* 282 *F. 2d,* at *pp.* 713–716.

■ The trial court followed the prescribed guides in determining the issue. It heard the witnesses, and after extensive argument by counsel for Wade, determined that the injection did not affect his will or intellectual capacity and that the confession was admissible. As we view the record, the trial court fulfilled its heavy responsibility in determining that the State had carried its burden of proving that appellant's will had not been overborne and that the requirements of due process had not been violated, insofar as the admission of the confession is concerned. *State v. Tassiello*, 39 *N. J.* 282, 291–292 (1963). We find no error on this issue.

## II.

Appellant next contends that he was entitled to have the trial court charge the jury on second degree murder and manslaughter, as it did with respect to defendant John Wade, because he could not be guilty of a higher offense than that of his codefendant if he had in fact been an aider and abettor. It is alleged that, as a result of submitting to the jury five possible verdicts for John Wade, including the two above mentioned, and three possible verdicts for Nathaniel Wade, omitting the two complained about, the instructions were "contradictory" and "wholly incomprehensible" to the jury, as indicated by their inability to agree upon a verdict for three days. Thus, the charge was "manifestly harmful" and "prejudicial" to appellant.

The State's theory of the case, as set forth in the charge of the court and as described by the prosecution's proofs, was that Nathaniel Wade aided and abetted his brother in perpetrating a robbery which resulted in the death of its victim. No other theory was presented by the State as to appellant. Nathaniel Wade denied he participated in a felony, and John Wade claimed he was acting in self-defense when Eckstein was killed. They testified that they had come to Paterson on business—Nathaniel, to purchase an interest in a tavern, and John, to try to sell a gun. John Wade offered evidence that he had had negotiations with the decedent to sell him the gun, and when the latter refused to pay, an argument and scuffle ensued and the gun, pulled by the decedent, accidentally discharged. Appellant testified that at that time he was driving around the corner, noticed the scuffling and pulled up. John Wade got behind the wheel and they drove off.

According to the evidence proffered and the instructions given, the jury could not have found John Wade guilty of manslaughter without at the same time determining that the killing did not occur during the commission of a felony. If John Wade killed in the heat of passion during an altercation over the sale of the gun, he would be guilty of man-

slaughter, not felony murder, and Nathaniel Wade, charged solely with aiding and abetting his brother in the commission of a robbery, would have to be acquitted. If John Wade killed while perpetrating a robbery, he would be guilty of a felony murder. Once the jury found John Wade guilty of felony murder, it remained for them to determine only whether Nathaniel Wade aided and abetted his brother in this crime.

We find that the trial court correctly charged the jury as to appellant.

### III.

Finally we consider appellant's complaint that, despite the fact that there were no objections, certain comments of the prosecutor in his summation denied appellant a fair trial. The trial court, in its charge and on its own motion, referred to four statements in the prosecutor's summation and instructed the jury to disregard those remarks. However, appellant argues, the trial judge should have cautioned the jury with respect to other comments which he terms "the most improper and damaging," *i. e.*, that "Nathaniel has been convicted of crime twice and John has been convicted of crime thrice. They know just what happens in police work and they have had the experience. They know what to do and what not to do."

The record shows that Nathaniel Wade had been convicted in Georgia in 1948 of committing simple larceny, and in New Jersey in 1956 of carrying concealed weapons. Relying on the language of Mr. Justice Francis in *State v. Driver, supra,* 38 *N. J.,* at *pp.* 292–293, counsel argues that the prosecutor, by his comments, misused appellant's prior criminal record by attempting to influence the jury to believe that Nathaniel Wade's record made it more likely that he committed the crime with which he was charged, rather than merely to cast doubt upon his credibility. If true, such an attempt would invite the sound condemnation expressed in *Driver* (at *p.* 293, 183 *A. 2d,* at *p.* 675) :

"That type of comment is highly improper because it has a strong psychological appeal to lay jurors who understandably may be diverted thereby from an independent analysis of the evidence and into the effortless conclusion that 'once a thief, always a thief.' It warrants immediate intervention by the trial court and a vigorous instruction to counteract the prejudice that flows from it."

Appellant's short quotation, standing alone and taken out of context, possibly would bring the summation within *Driver's* reproof. But the parts of the summation immediately preceding and succeeding appellant's point of reference deny to the latter any "once a thief, always a thief" significance. The prosecutor stated:

"Ladies and gentlemen, you have heard one of the most fantastic, incredible stories that has ever been presented. These two defendants, John and Nathaniel Wade, they are the chief counsel in this case. They are the ones who didn't, in any shape or form, disclose their hand on the opening on March 13th of their defense counsel. They are the architects and the designers and the connivers of this defense. They are shrewd and calculating. They waited and they watched and they listened and they observed every move the State made. In the meantime, they were plotting and conceiving what their defense would be. They ran the show from the very moment this case began until this time. They knew enough about police work, they knew enough about the business and they came in here and told us a fabrication, a bunch of half truths and lies and their credibility—*what is their credibility and you ladies and gentlemen are to give weight to it.*

Nathaniel has been convicted of crime twice and John has been convicted of crime thrice. They know just what happens in police work and they have had the experience. They know what to do and what not to do.

John Wade, on the stand, was as cold as ice. He displayed nerves of steel and a disregard of the truth in a nerveless aloofness.

Nathaniel demonstrated on the witness stand the outward appearances of a man seeking sympathy because of his disability, but his use of the lie was equally as great as that of his brother, John." (Emphasis added)

As we read these remarks, the prosecutor was directing their import to appellant's credibility and not to any improper end. We find no error.

Affirmed.

40

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.