See also, D.C., 245 F.Supp. 67.

**Nathaniel WADE, Petitioner,**

**v.**

**Howard YEAGER, Warden, New Jersey State Prison, Respondent.**

Civ. A. No. 1032–63.

United States District Court
D. New Jersey.

March 5, 1964.

**WORTENDYKE, District Judge:**

This is an application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241 et seq., for review of petitioner's conviction in the Passaic County Court (of New Jersey) on March 31, 1961, of first degree murder. He is presently serving a life sentence thereon in New Jersey State Prison.

Petitioner appealed from the conviction to the New Jersey Supreme Court which affirmed, State v. Wade, 1963, 40 N.J. 27, 190 A.2d 657. The petitioner here urges, in support of his application for the writ, the same grounds upon which he sought reversal in the New Jersey Supreme Court, and no others.

In accordance with the directive expressed in Brown v. Allen, 1953, 344 U.S. 443, 457, 463–464, 73 S.Ct. 397, 97 L.Ed. 469, and Townsend v. Sain, 1963, 372 U.S. 293, 319, 83 S.Ct. 745, 9 L.Ed.2d 770, I have carefully examined and conscientiously considered the transcript of the trial testimony (which, including the voir dire examination of jurors, summation of counsel and court's charge, aggregates 4,956 pages) insofar as it relates to the three grounds presently urged by the petitioner and already decided by the New Jersey Supreme Court. The transcript reveals that, with respect to the three grounds of the present petition, the trial judge and jury resolved the material facts, pursuant to a fair hearing supported by the record, and no newly-discovered evidence has been presented in regard to these grounds. Consequently, there is no need for, nor would it be appropriate to grant, a hearing before this Court for the present petitioner. Townsend v. Sain, supra, pp. 312–318, 83 S.Ct. pp. 756–760.

With respect to petitioner's first ground, namely that his constitutional rights were infringed by the trial court's admission in evidence of an alleged confession obtained from him in violation of the principles of due process, the evidence in the case has been accurately and comprehensively summarized by Mr. Justice Schettino of the New Jersey Supreme Court in that Court's opinion, with which I independently concur, on petitioner's appeal.[1] In uphold-

---

1. "According to Nathaniel Wade's testimony of the events of March 22, Detective Lawless of the Paterson police arrived at the New York hospital that morning and carried appellant to a waiting police car. Detective Neeson and two other police officers were present and assisted Detective Lawless. Appellant complained to the latter that his leg [broken at the time of his capture] was in pain and that his left arm was paralyzed, and he asked for medical attention. The police officers then drove appellant to a police station on Centre Street in New York City. There he was placed in a wheel chair and carried into the building. He was fingerprinted and photographed. Wade stated that he had chills and was in pain and again asked for medical attention. The officers informed him that they were going through extradition proceedings and that when they had finished he would be placed in a hospital in Paterson. Wade continued to complain during the hour and a half he remained at the Centre Street building. He did testify, however, that Detective Neeson assisted him as best he could. In fact, on cross-examination, appellant testified that the officers treated him very kindly and handled him very carefully because they were concerned about his leg, and that no one had abused him in any way.

"Wade was informed that next they were going to court to complete the extradition proceedings. He expressed re-

ing the admission of Wade's confession by the trial court, the New Jersey Court said:

"Thus, the issue of voluntariness is reduced to a question of whether

the demerol injection deprived Wade 'of a rational intellect and a free will.'" [Citing Blackburn v. State of Alabama, 1960, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242.

luctance to sign any waiver and asked to call his lawyer. One of the officers got Mr. Morley, Wade's New Jersey attorney, on the telephone. Mr. Morley advised Wade to waive extradition.

"Appellant, as at all times that day, was then assisted from the building and into a waiting car and driven to a criminal court. Still in pain and still suffering from chills, Wade was wheeled into court. It was then about two o'clock and court was not in session. Wade had not had lunch and he asked two of the officers who were going to the cafeteria to bring him some food. He was informed that he would eat after the extradition proceedings were completed. Wade appeared before a magistrate and then was taken to the eleventh floor to the court of special sessions, where he signed the necessary papers.

"Thereafter, appellant was driven to the Paterson police headquarters. Upon his arrival, Wade testified that he reminded the officers that they had promised to get him medical attention and they replied that they would see about it. Wade was then taken to the third floor, removed from a wheel chair and placed on a desk chair. Wade's wife and a friend, William Jones, were in the room and they talked together for a short while. Then, as the result of a police call, Doctor Schmidt arrived from a hospital. Wade informed him of pain in his leg and stomach, chills and paralysis of his left arm. According to Wade's testimony, Detective Lawless mentioned demerol, and Detective Neeson suggested that Wade be given 'a big bang of it' because his leg was broken in thirteen places. The doctor injected a hypodermic needle into Wade's left arm.

"Appellant said that this relieved the pain but that within 10 or 15 minutes it put him 'in a fog.' Wade's wife and Mr. Jones continued to talk to him, but he claims he could not understand what they were saying. After they left, Detectives Lawless and Neeson spoke to Wade, but he could not understand them either. Then he noticed that Mr. Morley was present. Morley asked Wade how he felt and the latter replied, 'very bad.' The only other thing he remembered about Morley's visit was that he filled his pipe with tobacco and departed.

"Appellant also testified that after Morley left, Detectives Lawless and Neeson had Wade moved to a little side room. Appellant was gagging and the officers suggested that he eat a sandwich to stop it. Wade told them he had no desire for food, so they suggested he drink some Coca Cola. He did and threw it up.

"Detective Neeson then sat behind a typewriter and Detective Lawless picked up some papers and told appellant they had some questions to ask of him. Wade testified that he was dizzy and in a fog and told the officers that he preferred not to answer any questions at that time. They insisted and put questions to appellant. He stated that he did not know or understand what they were saying, nor did he recall reading, correcting, initialing or signing any papers at this inquiry. He merely remembered that he was sick to his stomach, that his arm was paralyzed, and that his leg was again in pain. He also vaguely remembered being taken by the two detectives to a cell and given a cup of water and a large white pill to swallow.

"The next thing Wade recalled was Detective Neeson's awakening him the following morning. He said he was still nauseous and in a fog. Neeson asked him to sign a paper so that a photographer could take Wade's picture. A picture was taken.

"In connection with the issue of voluntariness, appellant called Dr. Schmidt. He testified that on March 22, 1960, he was summoned to the Detective Bureau in the Paterson police station. There he saw Nathaniel Wade, his leg in a cast. Wade complained of pain, which seemed to be confirmed by the expression on his face. Doctor Schmidt injected 100 milligrams of demerol into Wade's arm and left a sleeping pill for his use. Two detectives and Mrs. Wade were present at that time. Doctor Schmidt was in the Detective Bureau about 10 minutes all told.

"Doctor Schmidt described demerol as a synthetic analgesic which acts as a sedative, an energetic and a spasmoltic. He said the drug takes effect soon after the injection and the effect lasts for about four hours. However, Doctor Schmidt could not say what effect it had on the mental

"A confession made by a person while under the influence of drugs is not *per se* involuntary. State v. Wise, [19 N.J. 59 (1955)], 19 N.J. at pp. 85–92, [115 A.2d 62 at pp. 75–79. * * *]"

processes of Wade because the reaction differs with each person. Pressed further, the doctor testified that, in light of the dosage administered and Wade's size, he did not think it would have affected Wade to a considerable extent. He did say that if a person is not in pain, such as one being prepared for surgery, demerol has a marked sedative effect, whereas if a person is in pain, with its attendant state of tension and apprehension, demerol has a sedative effect which calms the person down to a level that might be considered normal. When asked whether demerol occasionally produces euphoria, Doctor Schmidt replied that that was rare. He admitted that ambulatory patients may become dizzy after receiving a dose of demerol and that there are some persons who react by vomiting or becoming nauseous, but on cross-examination, Doctor Schmidt said that these side effects, if they occur, usually take place twenty minutes to an hour after the injection.

"The defense also called Mary Wade, appellant's wife. She testified that she arrived at the police station with William Jones before Nathaniel. When the latter arrived, Mrs. Wade and Mr. Jones talked to him, and according to Mrs. Wade, Nathaniel complained of pain and seemed in a daze. She testified that a doctor arrived and injected a needle into Wade's arm. Mrs. Wade and Jones remained after the doctor left to talk to appellant but the latter made no sense in his conversation with her. Mrs. Wade and Jones departed before Morley arrived.

"Neither Mr. Jones nor Mr. Morley was called to testify. Compare State v. Clawans, 38 N.J. 162, 170–175, 183 A.2d 77 (1962), on the failure of a party to call a witness.

"The version of events leading up to and surrounding Wade's confession, as testified to by Detectives Lawless and Neeson, differs somewhat from appellant's version. The detectives arrived at the New York hospital about 9:20 A.M. They took Wade to a police station for photographing and fingerprinting and remained there until about 1 P.M. While there, Wade was given lunch. Wade also requested that he be allowed to call his attorney, which request was granted. The detectives then took Wade to felony court where he was arraigned at 2:15. From there Wade was taken to the court of special sessions on the eleventh floor of the same building. They waited there until 3:45 P.M., at which time Wade waived extradition. The detectives and Wade arrived at the Paterson police station at 5 P.M. and Wade was booked soon after. At 5:10 P.M. Mrs. Wade and Mr. Jones were allowed to visit with appellant on the third floor and remained with him until 6:30. Wade was given dinner at 5:20.

"The detectives testified that throughout the day Wade complained that he was uncomfortable, not that he was in pain. When they arrived in Paterson they asked him if he wanted a doctor. Complying with his request, Doctor Schmidt was summoned from Paterson General Hospital. He arrived about 5:35, administered the injection and departed within 10 minutes, leaving a sleeping pill with Neeson. Thereafter Mrs. Wade and Jones were observed in normal conversation with Wade. At 6:35, five minutes after Wade's visitors departed, Mr. Morley arrived and engaged in private conversation with Wade until 7:05.

"Right after Mr. Morley left, the two detectives asked Wade of [sic] he wished to give them a formal statement. He agreed. The taking of Wade's confession began at 7:12 and concluded at 9:07 P.M. Lawless asked the questions; Neeson typed the answers. They testified that Wade's condition throughout the day remained unchanged, that before and after the injection he appeared normal and spoke coherently. Lawless did testify, however, that while they were taking his statement, Wade said he felt more at ease. Wade read the statement for about 25 minutes, made some corrections, initialed the sheets and signed the last page at 9:25 P.M. The detectives testified that during the taking of his confession Wade did not complain that he was nauseous or dizzy, nor did he vomit. They testified that he had a coke before they began and was allowed to interrupt his recital once for another coke and a candy break.

"Wade was put in a cell at 9:40 and given the sleeping pill by Neeson. Both detectives next saw Wade in his cell the following morning. Lawless denied that Wade then signed a paper and neither detective could remember Wade's being photographed in the cell, although Neeson testified that Wade was photographed later that morning in the station photograph room." (40 N.J. at pp. 30–35, 190 A.2d at pp. 658–661).

"The State did not contest the testimony of Doctor Schmidt that Wade was probably under the influence of the demerol injection for about four hours. The sharp conflict of testimony exists as to the effect of the demerol injection on Wade; he claimed he was nauseous, dizzy and 'in a fog' and did not know what he was doing; the detectives testified that he appeared normal and spoke coherently. Doctor Schmidt could not testify as to the effect of the injection on Wade but was of the opinion that, although the reaction may differ with the person, it probably had little effect on Wade. * * As we view the record, the trial court fulfilled its heavy responsibility in determining that the State had carried its burden of proving that appellant's will had not been overborne and that the requirements of due process had not been violated, insofar as the admission of the confession is concerned." (40 N.J. at pp. 35–36, 190 A.2d at pp. 661–662).

Although I recognize that this Court is not bound by the decision of the New Jersey Supreme Court, Fay v. Noia, 1963, 372 U.S. 391, 421–422, 83 S.Ct. 822, 9 L.Ed.2d 837, the evidence of the voluntariness of the confession was in dispute. Therefore the State court's findings of fact, as affirmed by the New Jersey Supreme Court, are persuasive. United States ex rel. Smith v. State of New Jersey, 3 Cir. 1963, 323 F.2d 146, 151. The New Jersey Supreme Court also applied the appropriate standard for the voluntariness of a confession under the Fourteenth Amendment; see Townsend v. Sain, supra, 372 U.S. 307–309, 83 S.Ct. 754–755. In distinguishing Townsend, the New Jersey Court correctly concluded that petitioner's will was not "overborne" or "his capacity for self-determination seriously impaired" by the administration of the demerol in-jection several hours earlier. My independent examination of the record in this case brings me to the same conclusion reached by the New Jersey Supreme Court upon the evidence presented to the trial court. I adopt its summary of that evidence, and concur in its discernment of the voluntariness of the confession by the standard of the Fourteenth Amendment, in those facts.

■■ The present petitioner's second ground is found in his contention that, in the words of Justice Schettino (40 N.J. at p. 37, 190 A.2d at p. 662), "he was entitled to have the trial court charge the jury on second degree murder and manslaughter, as it did with respect to defendant John Wade [brother and codefendant of Nathaniel], because he could not be guilty of a higher offense than that of his codefendant if he had in fact been an aider and abettor." That is a matter involving no deprivation of Federal constitutional rights and is appropriately presentable only on appeal. In addition, Wade urges here, as he did in the New Jersey Supreme Court, that certain comments of the Prosecutor in his summation to the trial jury were so prejudicial as to amount to a denial of a fair trial for the petitioner. As was accurately pointed out in Justice Schettino's opinion, a reading of the entire summation eliminates any justifiable basis for inference that the particular comments singled out by the petitioner from the Prosecutor's summation were prejudicial. Moreover, it is elementary that *had* such remarks *been* prejudicial, such would likewise be matter for appellate review rather than habeas corpus. United States ex. rel. Saunders v. Myers, 3 Cir. 1960, 276 F.2d 790; United States ex. rel. Birch v. Fay, D.C.N.Y.1961, 190 F.Supp. 105.

For the reasons aforesaid, the petition of Nathaniel Wade for a writ of habeas corpus filed in this Court on December 5, 1963, is dismissed.