**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0993-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MERRILL C. SPENCER,

    Defendant-Appellant.

_____

Argued June 5, 2024 – Decided August 6, 2024

Before Judges Susswein and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 17-05-0691.

Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the briefs).

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for respondent (Bradley D. Billheimer, Ocean County Prosecutor; attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

PER CURIAM

Defendant Merrill C. Spencer appeals from his guilty plea conviction for aggravated manslaughter. He contends the trial court erred in denying his motion to suppress his video recorded confession, claiming police violated his Miranda[1] rights. He also contends the court erred in imposing the thirty-year prison term recommended in the plea agreement. After carefully reviewing the record in light of the governing legal principles and arguments of the parties, we affirm the conviction and sentence.

I.

We discern the following pertinent facts and procedural history from the record. On June 12, 2006, the victim, Johntel Thomas, was shot and killed near an apartment complex in Lakewood. A witness, Shatima Brown, told Ocean County Prosecutor's Office Detective Lindsay Woodfield that Thomas had been with his cousin, Rasheem Garrett, and Garrett's girlfriend, Tanya Harden. Brown reported that she heard a man known as "Zone" may have been involved in the killing.

Woodfield and Detective Peter Aakjer of the Lakewood Police Department interviewed Garrett and Harden. They relayed to the detectives that

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0993-22

on June 12 around 11:00 p.m., they were walking with Thomas in the area where his body was ultimately found. As the group turned onto Alder Street, Thomas crossed to the south side of the street and Garrett and Harden went to the north side. Shortly after they separated, Garrett heard a "boom" and saw a man with his arm extended whom he recognized as "Zone."

After the shooting, Garrett saw Zone sitting on a stoop in the apartment complex with a man he knew as "S-2." Garrett and Harden spoke to Zone and S-2 about Thomas, and Garrett subsequently confirmed that Zone was the person who had shot his cousin.

Garrett identified defendant from a photograph as the person he knew as Zone. Garrett also identified a photograph of Marvin Pressley as the person he knew as S-2.

Harden confirmed to the detectives that she was present during the conversation between defendant and Pressley. She overheard defendant talking on his cellphone, telling an unknown party that he needed to get rid of the "arty," referring to a gun.

Video surveillance recordings corroborated Garrett's and Harden's accounts. The videos show that on June 12, 2016 at 10:20 p.m., defendant exited Apartment 106 and walked along a breezeway between that apartment and

A-0993-22

Apartment 108. Defendant was wearing a light-colored hooded sweatshirt, sweatpants, and a Chicago Bulls baseball cap. At 10:21 p.m., he walked past a playground in the apartment complex.

At 10:58 p.m., Garrett, Harden, and Thomas are seen walking through a breezeway in the complex. At 11:01 p.m., the surveillance video shows defendant walking from the area where Thomas's body was found. At 11:02 p.m., defendant entered the vestibule of Apartment 106 carrying the sweatshirt he had previously been wearing. At 11:04 p.m., defendant exited the vestibule now wearing a New York Yankees baseball hat and a shirt with the number forty-two on it.

On June 13, 2016, around 4:30 p.m., officers approached defendant. He told them he resided in Apartment 106A. He also stated he has two nicknames, "Scheme" and "Zone."

The detectives obtained an arrest warrant and a search warrant for Apartment 106A. The arrest warrant charged defendant with murder, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. During a search incident to defendant's arrest, Lakewood Detective Nate Reyes seized two cellphones from his person.

A-0993-22

Defendant was transported to the Lakewood Township Police Department and an electronically recorded interrogation was conducted. Defendant was informed he was under arrest and advised of the charges filed against him. Woodfield told defendant she would read him his rights "[a]nd after that, if you decide that you want to talk, then we'll talk about it." Defendant responded, "[b]ut what I'm saying though, how the f[*]ck am I under arrest?" Woodfield reiterated, "I'm going to explain it to you, but I'm going to read you your rights first." Aakjer said, "[u]ntil we get through this, we can't talk about that, does that make sense?" Defendant answered, "[m]an, well, that sh[*]t is dope." Woodfield proceeded to read defendant his <u>Miranda</u> rights. Defendant acknowledged he understood his rights and signed the waiver form.

Soon after questioning began, Woodfield told defendant that police had video, interview, and phone records evidence against him. She said:

> 'Cause video, interviews, phone records, like we been working I don't know how many hours on this. We're the cops involved. We have a lot of probable cause. We basically can see the video, we see it happen. We have people identify you. Um, you want me to keep going? I know you changed your clothes. I know you know what I mean, you come back in and out. Like we see it happen, so it's either, you know, you can explain why, maybe I don't, I don't know why you, 'cause he didn't seem like really anybody had any issues with him. . . .

Defendant denied having any problems with the victim or involvement in the murder.

Aakjer asked defendant why he walked back to the basketball court near his apartment by himself "for like two minutes" and suggested it was to throw the gun away. Defendant responded he regularly smokes PCP and went to the basketball court to "contact people" about smoking.

Aakjer said, "you either wanna tell us the truth or we could sit here for like hours and bullsh[*]t." Defendant responded, "([i]naudible) sit for hours, 'cause you gonna go have me confessing to some sh[*]t I didn't do." Aakjer replied, "I don't want you . . . [w]e don't like that word confess—listen to me, we're just going to give you the opportunity just to talk." Woodfield reiterated they had videos of defendant, stating "[l]ike I can see you. That's why I don't really want to sit here and do this whole . . . dance with you, like, it wasn't me . . . if that's what you want to say, but . . . ."

The detectives repeatedly asked defendant for a reason for the shooting. Woodfield emphasized, "I was hoping that you were gonna give me a reason like you guys had a fight," because without a reason, "[i]t makes the whole situation worse for [defendant]." Woodfield continued:

> I . . . don't know. I think you feel bad a little bit.
> Call me, whatever, but I talk to people a lot for a living.

6

A-0993-22

That's what I do, all kinds of people, people like you, people like me, kids, rape victims, murders, whatever.

Maybe you don't feel bad, but I think you do a little bit, slightly. And if you do, that's a, that's a good sign. That weighs heavy on your end and that weighs heavy in my opinion of you and my opinion of you, although may not matter, it should 'cause I have conversations with [a]ssistant [p]rosecutors and I have conversations with people like that who, who review the case and who look at the case. And if I can go back there and say, you know what, he felt bad, he seems concerned, there was some regret, it's different than me going back and saying, he came in, he denied the whole f[*]cking thing. He don't care. He was ordered or he this and he that and it is what it is, and we keep it moving and that's how, and here we go on to the next one. 'Cause, you know, as I know, this happens every day, whether it's here or not, it's on.

Bottom line is now you're involved in it, so you can either explain it, talk to me about it, let me know how you feel about it and we can move on from there and hopefully get past it, but I don't want to do a song and dance, like we don't need to say I wasn't there, it wasn't me, it was this.

It's a video, it's not just people and I don't care what anybody says. I see it, so we either talk about it, you tell me why—not even why. You don't have to tell me anything, just tell me do you feel bad about it. Do you wish that didn't happen? Something like that, I don't know.

Defendant answered, "I wish I wasn't here." Woodfield responded, "I know you wish you weren't here. I wish I was home, too. Trust me. But, unfortunately,

7

A-0993-22

we're both here.  We both know what happened and we can talk about it."  She continued, "and be done talking about it or we can sit here, lie about it, or we can[]not talk about it."

Defendant then asked to "[t]alk to [his] baby mama," and the detectives said they would try to make it happen.  Defendant said he wanted to tell her "[t]hat I'm sorry" and explained he has a six-month-old baby.  Woodfield said, "[l]et's be honest, the only thing that matters is your baby and your baby's mama right now and I get that.  If I let you talk to your baby mama, hopefully we can make that happen, we gonna talk about what happened?"

Defendant told detectives that although he has a criminal history, he never had an assault charge.  Woodfield dismissed his record as "nonsense."  Defendant told detectives he had just spoken to his mom.  The following colloquy ensued:

> Woodfield:  And what were you guys talking about?
>
> Defendant:  Last night.
>
> Woodfield:  And what was she saying?
>
> Defendant:  Telling me to do better.
>
> Woodfield:  Well, now you're gonna do better.
>
> Defendant:  Now I'm gonna be in jail forever.

A-0993-22

> Woodfield: No, you're not gonna be in jail forever. I don't, I mean, I don't know how long you're gonna be in jail, . . . I don't [know] if the answer is forever, but I do know that you're gonna do better because you're gonna sit here and you're gonna talk about what happened and that's a step in the right direction. And it's a step for everybody, especially your baby mama, especially your son, because at the end of the day, the last thing in your goal in your life I think from now on should be that your son doesn't end up in the same position you're in. That's it. Can get him out of where he is and into a better situation.

Defendant explained he has three children. Woodfield told defendant, "[y]ou gotta make it right by everybody." Aakjer said defendant could call his "baby mama" when they were done with the interview.

Woodfield told defendant, "[y]ou made a mistake, okay, now we'll handle it. Now you gotta deal with it. And the first step in dealing with it is talking about it, next step, moving on and figuring out what it is that you gotta do to pay for the mistake that you made." Woodfield told defendant, "I know that you're gonna feel better when we talk about what we need to talk about and just get moving on that and get on with it." Aakjer added, "it's gonna feel good to talk about it, as strange as that sounds" and "[i]t will feel like a weight lifted, I promise."

Woodfield continued,

A-0993-22

[y]ou got three, I'm sure, beautiful children right now. At some point you wanna be back in their life, and either way you want them to see you and be there for them in a different way than the person that you were prior to all of this. Now is your opportunity to be there in person, to be a dad, 'cause I'm sure you were a good dad, but the streets got in the way. Now you can be a great dad and that's . . . all that matters.

Defendant responded, "I'm gonna be a great dad locked up." Aakjer replied, "you can prove to them that you know what, if you make a mistake, you own up to it and you say this is what happens."

Defendant then admitted he shot Thomas with a .32 caliber handgun because he was worried Thomas was going to rob him. He hid the gun under the rain gutters outside his apartment. He put the sweatshirt he wore in two Walmart shopping bags and threw them into the dumpster by his apartment.

During the interrogation, defendant consented to officers searching his Samsung flip phone. He did not give consent to search the second cellphone that was seized when he was arrested. Woodfield obtained a warrant to search the second phone.

Woodfield testified defendant did not appear to be under the influence of drugs or alcohol during the interrogation. There was no odor detected, his speech was not slurred, and his eyes were not watery or droopy. No narcotics were found on defendant's person or in his home.

10

After defendant's arrest, Ocean County Sheriff's Department Crime Scene Investigation Unit Detective Michael T. Senger processed defendant for gunshot residue, collected his clothing, and obtained a consent for buccal swabs. When Senger started to test defendant's left hand for gunshot residue, defendant asked the detective what it was for. Senger explained the procedure and defendant stated, "[i]t wasn't that hand, it was this hand," raising his right hand.

In May 2017, defendant was charged by indictment with first-degree knowing/purposeful murder, N.J.S.A. 2C:11-3 (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a firearm by a previously convicted person, N.J.S.A. 2C:39-7(b) (count four).

Defendant filed a motion to suppress his statements to police. On October 27, 2017, the trial judge convened a Miranda hearing. The videotaped audio statement was played for the court.

On November 29, 2017, the trial judge denied defendant's motion to suppress his statements, rendering an oral decision. After recounting the facts and relevant case law, the judge stated:

> In the current case, there's no dispute that this was a custodial interrogation, as defendant was in

A-0993-22

custody and under arrest at the time of the questioning. At the onset of the interview, defendant was advised that he was under arrest and his charges were read to him. Detectives then read defendant his Miranda warnings and defendant signed the Miranda form and waiver. At no point did defendant request to stop the interrogation or ask to speak to an attorney.

. . . .

After Detective Linsday Woodfield read the waiver to defendant, he signed the waiver form. At the time of the questioning, defendant was [thirty-five] years old and had prior convictions and arrests from New Jersey, New York and Florida and thus was not unfamiliar with the criminal justice system. Throughout the questioning, defendant was calm, and cooperated with the officers. The duration of the questioning was relatively brief and defendant seemed comfortable talking to the detectives. Furthermore, when asked if he could read, defendant replied, of course, yeah.

Therefore, this [c]ourt finds the defendant's Miranda rights were knowingly and intelligently waived. Consequently, any statements made during the interrogation should not be suppressed.

[The d]efense asserts that defendant may have been under the influence of PCP during the statement. However, from viewing the video, defendant does not appear to be impaired in any way. Defendant's answers to questioning were coherent and often detailed. Moreover, a confession made under the influence is not per se involuntary, [State v. Wade, 40 N.J. 27, 35 (1963)]. There is no indication that his rational intellect or free will were in any way impaired by drug use.

12

Consequently, there's no reason to suppress these statements on the ground of possible drug usage.

With respect to the spontaneous statement made during the gunshot residue test, this [c]ourt finds that was a voluntary statement and not in response to any sort of questioning by detectives. Therefore, it was not necessary for defendant to have been issued a Miranda warning in order for the statement to be admissible. Therefore, this statement should not be suppressed.

Based on the foregoing, defendant's motion to suppress [his] statement[s] is denied.

On November 22, 2019, defendant pled guilty to count one, amended pursuant to the plea agreement to charge first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). Defendant preserved his right to appeal the denial of his motion to suppress his statement.

On December 9, 2020, the trial judge sentenced defendant on amended count one to thirty years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The remaining counts were dismissed pursuant to the plea agreement. The judge found no mitigating factors. She found four aggravating factors: the risk of defendant reoffending, N.J.S.A. 2C:44-1(a)(3); the substantial likelihood defendant is involved in organized criminal activity, N.J.S.A. 2C:44-1(a)(5); defendant's prior criminal record, N.J.S.A.

2C:44-1(a)(6); and the need to deter defendant and others, N.J.S.A. 2C:44-1(a)(9).

This appeal follows. Defendant raises the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS [DEFENDANT]'S STATEMENT BECAUSE THE INTERROGATING OFFICERS MISLED [DEFENDANT], CONTRADICTED THE MIRANDA WARNINGS, AND RENDERED HIS WAIVER AND STATEMENT INVOLUNTARY.

POINT II

THE MATTER MUST BE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT IMPOSED THE MAXIMUM THIRTY-YEAR NERA SENTENCE BASED ON AN IMPROPER FINDING AND WEIGHING OF AGGRAVATING AND MITIGATING FACTORS.

Defendant raises the following additional contentions in his reply brief:

POINT I

THE STATE'S RELIANCE ON STATE V. ERAZO IS MISPLACED BECAUSE, IN CONTRAST, THE DETECTIVES IN THE PRESENT MATTER COERCED [DEFENDANT]'S WAIVER AND CONFESSION BY REPEATEDLY CONTRADICTING MIRANDA AND TELLING [DEFENDANT] THAT WAIVING HIS RIGHTS WOULD BENEFIT HIM.

14

II.

We begin our analysis of defendant's <u>Miranda</u> arguments by acknowledging the governing legal principles. The scope of review of a decision on a motion to suppress is limited. <u>State v. Ahmad</u>, 246 N.J. 592, 609 (2021). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" <u>State v. S.S.</u>, 229 N.J. 360, 374 (2017). An appellate court gives deference to those factual findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." <u>State v. Elders</u>, 192 N.J. 224, 244 (2007) (quoting <u>State v. Johnson</u>, 42 N.J. 146, 161 (1964)). "We ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" <u>State v. Goldsmith</u>, 251 N.J. 384, 398 (2022) (quoting <u>State v. Gamble</u>, 218 N.J. 412, 425 (2014)).

However, legal conclusions drawn from those facts are reviewed de novo. <u>State v. Radel</u>, 249 N.J. 469, 493 (2022). Relatedly, a reviewing court is not bound by a trial court's determination of the validity of the defendant's waiver

A-0993-22

of constitutional rights or the voluntariness of a confession since those are deemed to be legal questions. State v. O.D.A.-C., 250 N.J. 408, 425 (2022).

Turning to substantive legal principles, "'[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "Our law maintains 'an unyielding commitment to ensure the proper admissibility of confessions.'" State v. Sims, 250 N.J. 189, 211 (2022) (quoting State v. Vincenty, 237 N.J. 122, 132 (2019)).

"[A] knowing, intelligent, and voluntary waiver" of Miranda rights "is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." State v. A.M., 237 N.J. 384, 398 (2019); see State v. Presha, 163 N.J. 304, 313 (2000). When making this analysis, courts consider the defendant's age, education, and intelligence, whether they were advised of their constitutional rights, the length of the detention, whether the interrogation was repeated and prolonged, and whether physical punishment or mental exhaustion were involved. Nyhammer, 197 N.J. at 402. Because New Jersey's custodial interrogation jurisprudence

provides greater protections than are afforded under federal law, <u>Vincenty</u>, 237 N.J. at 132, "our review of police-obtained statements is 'searching and critical' to ensure protection of a defendant's constitutional rights." <u>State v. Burney</u>, 471 N.J. Super. 297, 314 (App. Div. 2022) (quoting <u>State v. Patton</u>, 362 N.J. Super. 16, 43 (App. Div. 2003)). "[F]or the statement to be admissible, the court must find it was voluntary beyond a reasonable doubt." <u>Id.</u> at 315.

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession. Due process requires the State to 'prove beyond a reasonable doubt that a defendant's confession . . . was not made because the defendant's will was overborne.'" <u>O.D.A.-C.</u>, 250 N.J. at 420 (quoting <u>State v. L.H.</u>, 239 N.J. 22, 42 (2019)). We evaluate voluntariness using the totality-of-the-circumstances test. <u>Ibid.</u>

A "free and voluntary" confession is not one extracted by "threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." <u>Brady v. United States</u>, 397 U.S. 742, 753 (1970) (quoting <u>Bram v. United States</u>, 168 U.S. 532, 542-43 (1897)). Furthermore, a police officer cannot directly or by implication tell a suspect their statements will not be used against them. <u>See</u> <u>State in re A.S.</u>, 203 N.J. 131, 151 (2010) ("A police officer cannot directly contradict, out of one side of his mouth,

17

the <u>Miranda</u> warnings just given out of the other.") (quoting <u>State v. Pillar</u>, 359 N.J. Super. 249, 268 (App. Div. 2003)); <u>State v. Puryear</u>, 441 N.J. Super. 280, 298 (App. Div. 2015) (holding the interrogator's representation impermissible where the interrogator told the defendant he "could not hurt himself and could only help himself by providing a statement" because that "contradicted a key <u>Miranda</u> warning"); <u>see also</u> <u>L.H.</u>, 239 N.J. at 47-48 ("Interrogating officers are not allowed to disarm the <u>Miranda</u> warnings during the interrogation by falsely asserting or suggesting that a suspect's words will be used in his favor and not against him in court.").

"Unlike the use of physical coercion, . . . use of a psychologically-oriented technique during questioning is not inherently coercive." <u>State v. Galloway</u>, 133 N.J. 631, 654 (1993). "Because a suspect will have a 'natural reluctance' to furnish details implicating himself in a crime, an interrogating officer may attempt 'to dissipate this reluctance and persuade the [suspect] to talk.'" <u>L.H.</u>, 239 N.J. at 43-44 (alteration in original) (quoting <u>State v. Miller</u>, 76 N.J. 392, 403 (1978)). One permissible way is by "[a]ppealing to [the suspect's] sense of decency and urging [them] to tell the truth for [their] own sake. . . ." <u>Miller</u>, 76 N.J. at 405.

A-0993-22

We next apply these basic custodial interrogation principles to the present facts as found by the trial judge.  Defendant argues that "[u]nder the totality of the circumstances, the State failed to meet its burden, and therefore, [his] statement must be suppressed."  The gravamen of defendant's argument is that his waiver and subsequent confession were involuntary because the detectives "repeatedly and directly contradicted the <u>Miranda</u> warning that anything said could be used against him."  More specifically, he argues "the detectives improperly coerced [him] into waiving his rights and giving a statement by assuring him—contrary to the <u>Miranda</u> warnings—that waiving his rights would gain favor with the prosecutor, allow him to spend more time with his children, and make him feel better."  He also argues the detectives' statements "amounted to a promise that his statement would help and not hurt him."

We are unpersuaded the detectives used impermissible interrogation tactics or otherwise violated defendant's constitutional rights.  In reaching that conclusion, we find helpful guidance in our Supreme Court's recent decision in <u>State v. Erazo</u>, 254 N.J. 277 (2023).  In <u>Erazo</u>, the defendant confessed to raping and murdering the eleven-year-old victim during his second interview, "five hours after his initial ninety-minute interview."  <u>Id.</u> at 284.  The Court found

"the detectives' tactics during the Mirandized interrogation were not coercive, did not minimize the Miranda warnings, and were consistent with our holding in [Sims, 250 N.J. at 189]." Erazo, 254 N.J. at 284. Under the totality of the circumstances, the Court explained, the detectives were "persistent, persuasive, and frequently appealed to defendant's conscience, [but] did not undermine Miranda in a way that our cases forbid." Id. at 304. The detective "merely spoke to defendant in a 'quiet, conversation, almost paternalistic tone,' and told him that he was not judging him, that '[t]hings happen,' and that there was value in having a dialogue about what happened." Ibid. For example, when the defendant denied knowing any details related to the missing victim, the detective told the defendant "they knew 'this little girl was at [his] apartment'" and she "had been found wrapped in something that came from his apartment." Ibid. Further, the detective "explicitly asked defendant to talk to him 'about something that you know is heinous, you know is no good.'" Ibid. (emphasis in original). The detectives told the defendant: "[d]on't let a moment of weakness define you as a person," "[y]ou have your entire life ahead of you," "I want you to understand the gravity that you're not being judged," and "[t]hings happen." Id. at 288-89.

On those facts, the Supreme Court concluded the detectives did not promise leniency, suggest the defendant's words "could not hurt him," or "minimize the significance of the Miranda rights." Id. at 304.

Here too we are satisfied the detectives' comments were a permissible appeal to defendant's "sense of decency." Miller, 76 N.J. at 405. Contrary to defendant's interpretation, the detectives did not promise defendant leniency in exchange for a confession, minimize the seriousness of the crime, or tell defendant his statement could not be used against him. See Erazo, 254 N.J. at 304. Instead, they urged defendant "to tell the truth for his own sake." See Miller, 76 N.J. at 405. Woodfield told defendant, "I know that you're gonna feel better when we talk about what we need to talk about and just get moving on that and get on with it." Aakjer added, "it's gonna feel good to talk about it, as strange as that sounds" and "[i]t will feel like a weight lifted, I promise."

We emphasize the detectives did not promise defendant he would receive a reduced sentence if he confessed. Rather, Woodfield told defendant, "I have conversations with [a]ssistant [p]rosecutors and . . . people . . . who review the case." She stated, "if I can go back there and say . . . there was some regret it's different than me going back and saying, he came in, he denied the whole . . .

21

thing." We do not believe that statement had a capacity to overbear defendant's will.

Nor did Woodfield coerce a confession by stating "you're not gonna be in jail forever" and "I don't know how long you're gonna be in jail . . . I don't [know] if the answer is forever, but I do know that you're gonna do better because you're gonna sit here and you're gonna talk about what happened and that's a step in the right direction." We note that statement was made in the context of defendant having told the detectives his mother urged him "to do better." Viewed in context, the detective's statement referred to "doing better" as a person, not doing better in the sense of receiving a reduced sentence. That interpretation is further supported by Woodfield having told defendant, "I do know that you're gonna do better because you're gonna sit here and you're gonna talk about what happened and that's a step in the right direction." See L.H., 239 N.J. at 43-44. Similarly, Woodfield urged defendant to set an example for his three children, saying "you can prove to them that you know what, if you make a mistake, you own up to it and you say this is what happens."

In sum, like the detectives in Erazo, Woodfield and Aakjer persistently, persuasively, and frequently appealed to defendant's conscience by urging him to tell the truth for his family and himself. Considering the totality of the

22

circumstances, we conclude the detectives did not promise leniency, contradict the Miranda warnings, or otherwise overbear defendant's will. See L.H., 239 N.J. at 44; see also O.D.A.-C., 250 N.J. at 425.

We likewise reject defendant's contention the detectives were obliged to determine whether he was under the influence of PCP and their "failure to do so leaves doubt as to the voluntariness of his waiver and statement." We note "[a] confession made by a person while under the influence of drugs is not per se involuntary." Wade, 40 N.J. at 35. But here, the evidence shows defendant was not under the influence. Woodfield testified defendant did not appear to be under the influence and no narcotics were found on defendant's person or in his home. Further, during the interrogation, defendant denied smoking PCP the night of the murder: "I wasn't high or anything, I didn't smoke anything."

Importantly, after reviewing the video of the interrogation, the trial judge found defendant's answers were "coherent and often detailed" and "[t]here is no indication that [defendant's] rational intellect or free will were in any way impaired by drug use." That finding is entitled to deference, Elders, 192 N.J. at 244, as there is credible evidence to support the trial court's conclusion.

In sum, there is substantial credible evidence in the record to support the trial court's conclusion that defendant's Miranda rights were knowingly and

23

intelligently waived, and that his confession was voluntary and admissible. A.M., 237 N.J. at 397. During the relatively brief questioning—the interrogation lasted about one hour—defendant "was calm, and cooperated with the officers." He was familiar with the criminal justice system through his prior convictions and arrest, demonstrated at least average intelligence, and confirmed he could read. See Nyhammer, 197 N.J. at 402. As we have explained, he was not subjected to a coercive interrogation; nor was he under the influence of PCP or any other drug. Accordingly, the trial did not err in denying his motion to suppress.

IV.

We turn next to defendant's sentencing arguments. We begin by acknowledging the narrow scope of our review. "Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for that of the sentencing court. State v. O'Donnell, 117 N.J. 210, 215 (1989). Accordingly, a sentence must be affirmed unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

24

sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Stated another way, a reviewing court may modify a defendant's sentence only when convinced that the sentencing judge was """clearly mistaken.""" State v. Jabbour, 118 N.J. 1, 6 (1990) (quoting State v. Jarbath, 114 N.J. 394, 410 (1989)).

It is well-established the consideration of aggravating and mitigating factors must be part of the deliberative process. State v. Dalziel, 182 N.J. 494, 505 (2005); State v. Cassady, 198 N.J. 165, 180 (2009). Trial courts must "explain and make a thorough record of their findings to ensure fairness and facilitate review." State v. Comer, 249 N.J. 359, 404 (2022). "'Proper sentencing thus requires an explicit and full statement of aggravating and mitigating factors and how they are weighed and balanced.'" State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Randolph, 210 N.J. 330, 348 (2012)); see State v. Case, 220 N.J. 49, 66 (2014) ("[C]ritical to the sentencing process and appellate review is the need for the sentencing court to explain clearly why an aggravating or mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence.") (citing

Fuentes, 217 N.J. at 73). An appellate court may also vacate a sentence for resentencing if the trial court considers an aggravating factor that is inappropriate to a particular defendant or to the offense at issue. State v. Pineda, 119 N.J. 621, 628 (1990).

Defendant argues his case "must be remanded for resentencing because the trial court imposed the maximum thirty-year NERA sentence based on an improper finding and weighing of aggravating and mitigating factors." Specifically, defendant argues the court erred in finding aggravating factor nine, the need to deter defendant and others. He contends the court "did not find specific deterrence and improperly double counte[d] an element of the offense in finding general deterrence." Further, defendant argues the court erred in failing to find mitigating factor twelve, willingness to cooperate with law enforcement, "despite ample evidence in the record."

We first address aggravating factor nine, N.J.S.A. 2C:44-1(a)(9). Our Supreme Court has "recognized that facts that established elements of a crime for which a defendant is being sentenced should not be considered as aggravating circumstances in determining that sentence." State v. Kromphold, 162 N.J. 345, 353 (2000) (citing State v. Yarbough, 100 N.J. 627, 633 (1985)). Otherwise, "every offense arguably would implicate aggravating factors merely

by its commission, thereby eroding the basis for the gradation of offenses and the distinction between elements and aggravating circumstances."  Ibid.; see Fuentes, 217 N.J. at 75; see also State v. Lawless, 214 N.J. 594, 601 (2013) ("[S]entencing courts must avoid double-counting any element of an offense as an aggravating factor.").

Here, defendant was convicted of first-degree aggravated manslaughter. N.J.S.A. 2C:11-4(a)(1) provides:  "[c]riminal homicide constitutes aggravated manslaughter when . . . [t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life."  Thus, death is a required element of the offense.  See State v. Carey, 168 N.J. 413, 425 (2001) ("It is well-settled that where the death of an individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes.").  Further, it is an element of the offense that the death was caused under circumstances manifesting extreme indifference to human life.

In finding aggravating factor nine, the trial judge explained, "no one for any reason has the right to take another's life and I give aggravating factor number [nine] the heaviest weight available."  On its face, that statement, viewed in isolation, would suggest the judge considered the taking of human life as an aggravating factor even though such conduct is a material element of the

aggravated manslaughter offense. However, viewed in context, we are satisfied

the trial judge did not improperly double count this element. Rather, the judge

was addressing defendant's stated reasons for committing the crime. Before

finding the aggravating factors, the judge explained:

> [A]t the time of your presentence interview, you told the probation officer that you murdered the victim in this case for someone else due to loyalty . . . that you were . . . told the victim was planning on robbing you, that you indicated the person who asked you to kill the victim had issues with the victim and filled your head with lies to get you to kill the victim.

Thus, in finding aggravating factor nine, the judge focused on the need to deter

defendant and others from engaging in organized crime-related violence—a

circumstance warranting deterrence that is not an element of aggravated

manslaughter.

But even assuming for the sake of argument the judge improperly

considered the fact that defendant had taken the victim's life in finding

aggravating factor nine, that consideration had no bearing on the ultimate

sentence as to warrant a remand. In this instance, the judge found four distinct

aggravating factors and no mitigating factors to weigh against them.

Furthermore, defendant was sentenced in accordance with his plea agreement,

which is presumed reasonable. See Fuentes, 217 N.J. at 70-71. We stress that

plea agreement allowed defendant to avoid conviction for knowing/purposeful murder—a crime for which defendant could have been sentenced to a life term. N.J.S.A. 2C:11-3(b)(1).

As for mitigating factor twelve, defendant contends "[t]here is ample evidence in the record to support a finding that [he] cooperated with the detectives; he told them where to find the weapon and clothes used in the offense and consented to the search of his phone." We are unpersuaded the trial judge erred by not sua sponte considering this mitigating factor,[2] which accounts for "[t]he willingness of the defendant to cooperate with law enforcement authorities," N.J.S.A. 2C:44-1(b)(12). In State v. Read, we

> question[ed] whether a confession qualifies as "cooperation" [for purposes of mitigating factor twelve], at least in the absence of any indication the confession identified other perpetrators or assisted in solving any other crimes . . . defendant's confession was not entitled to any substantial weight in determining his sentence in view of its limited benefit to the State.
>
> [397 N.J. Super. 598, 613 (App. Div. 2008).]

---

[2] We note this mitigating factor was not presented to the trial judge at sentencing. In considering the aggravating and mitigating factors, the judge stated: "there are no mitigating factors. Your attorney has advanced none, and from my understanding of the facts, there are none that can be argued."

Here, defendant did not identify any other perpetrators or assist in solving any other crimes. See ibid. And although defendant consented to the search of one of his cellphones, he did not consent to the search of his other phone, explaining "[b]ecause I'm a f[*]ckin' gang member." In these circumstances, we do not believe mitigating factor twelve applies, and even if it were deemed to be applicable, it would carry very little weight in counterbalancing the applicable aggravating circumstances.

In the final analysis, we conclude the trial judge properly sentenced defendant in accordance with his plea agreement after considering the relevant aggravating and mitigating factors. The sentence defendant received, moreover, in no way shocks the judicial conscience. See Cassady, 198 N.J. at 181.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0993-22